UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF THE FEDERAL REPUBLIC OF NIGERIA and ABUBAKAR MALAMI, THE ATTORNEY GENERAL OF THE FEDERAL REPUBLIC OF NIGERIA<br><br>Applicants. | Case No: 1:20-mc-00169 |

**MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. §1782(a) AUTHORIZING APPLICANTS TO CONDUCT DISCOVERY IN THIS DISTRICT FOR USE IN FOREIGN JUDICIAL PROCEEDINGS**

**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500

*Attorneys for Applicants the Federal Republic of Nigeria and the Honorable Abubakar Malami, the Attorney General of the Federation and Minister of Justice of the Federal Republic of Nigeria*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................................... ii

PRELIMINARY STATEMENT ..................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 3

    A. The Gas Supply and Processing Agreement ...................................................................... 4

        1. P&ID Had No Ability or Intention To Perform The Gas Supply and Processing Agreement ...................................................................................................................... 4

        2. The GSPA Was Not Properly Authorized Under Nigerian Law ................................. 7

    B. Discovery of P&ID's Bribes and Fraud ............................................................................. 7

    C. The Sham London Arbitration ......................................................................................... 12

    D. Status of The Nigerian Proceedings ................................................................................ 15

    E. The Relief Applicants Seek From This Court .................................................................. 16

ARGUMENT ................................................................................................................................ 17

    A. The Requested Discovery Meets The Statutory Requirements Of Section 1782(a) ......... 17

    B. The Discretionary Factors Weigh In Favor Of Issuing Discovery ................................... 21

CONCLUSION ............................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Ahmad Hamad Algosaibi & Brothers Co. v. Standard Chartered Int'l (USA) Ltd.*,
  785 F.Supp.2d 434 (S.D.N.Y. 2011) .........................................................................17

*In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery*,
  121 F.3d 77 (2d. Cir. 1997) ......................................................................................21

*In re Application of Chevron Corp.*,
  709 F.Supp.2d 283 (S.D.N.Y. 2010) ........................................................................18

*In re Aso*,
  2019 WL 2345443 (June 3, 2019, S.D.N.Y.) ...........................................................22

*In re Edelman*,
  295 F.3d 171 (2d Cir. 2002) .....................................................................................17

*In re Eurasian Bank JSC*,
  2020 WL 85226 (Jan. 2, 2020, S.D.N.Y.) ................................................................17

*In re Euromepa S.A.*,
  51 F.3d 1095 (2d Cir. 1995) .....................................................................................21

*In re Hansainvest Hanseatische Investment-GmbH*,
  364 F.Supp.2d 243 (S.D.N.Y. 2018) ........................................................................22

*In re Iraq Telecom Ltd.*,
  2019 WL 3798059 (Aug. 13, 2019, S.D.N.Y.) ...................................................17, 23

*In re OOO Promnefstroy*,
  2009 WL 3335608 (S.D.N.Y. Sep. 15, 2009) ..........................................................22

*In re Optimal Investment Services, S.A.*,
  773 F.3d 456 (2d Cir. 2014) .....................................................................................19

*In re Sealed Case*,
  932 F.3d 915 (D.C. Cir. 2019)..................................................................................23

*In re Setraco Nigeria Ltd.*,
  2013 WL 3153902 (June 19, 2013 M.D. Fla.) ....................................................19, 22

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ................................................................................... 19, 21, 22

*Mees v. Buiter*,
   793 F.3d 291 (2d Cir. 2015) ............................................................... 18, 19, 20

*Young v. U.S. Dept. of Justice*,
   1988 WL 131302 (S.D.N.Y. Nov. 28, 1988) ................................................ 20

**Statutes**

28 U.S.C. § 1782(a) ............................................................................................ Passim

31 U.S.C. § 5318(i) ................................................................................................. 24

**Rules**

Federal Rules of Civil Procedure 26 ..................................................................... 1

Federal Rules of Civil Procedure 45 ..................................................................... 1

**Regulations**

31 C.F.R. §§ 1010.610 ..................................................................................... 24, 25

Applicants the Federal Republic of Nigeria (the "FRN") and the Honorable Abubakar Malami, the Attorney General of the Federation and Minister of Justice of the FRN ("Malami" and together with the FRN, "Applicants"), by their undersigned counsel, respectfully submit this memorandum of law in support of the Applicants' request (the "Application") for an order pursuant to 28 U.S.C. §1782(a) ("Section 1782") and Rules 26 and 45 of the Federal Rules of Civil Procedure authorizing Applicants to conduct discovery in this district for use in criminal investigations and judicial proceedings pending in the FRN (the "Nigeria Proceedings").

## PRELIMINARY STATEMENT

To aid the Nigeria Proceedings, Applicants request authority to take discovery from Citibank, N.A. ("Citibank"), Allied Irish Banks ("Allied Irish"), HSBC Bank USA ("HSBC"), Standard New York, Inc. ("Standard New York"), Deutsche Bank Trust Co. Americas ("Deutsche Bank"), J.P. Morgan Chase ("JPMorgan"), United Bank for Africa ("UBA"), Bank of Cyprus, Fortis Private Banking Singapore Limited ("Fortis"), and Standard Chartered International (USA) Ltd. ("Standard Chartered" and together with Citibank, Allied Irish, HSBC, Standard New York, Deutsche Bank, JPMorgan, UBA, Bank of Cyprus and Fortis, the "Bank Respondents").

The Nigeria Proceedings concern a fraudulent scheme to defraud the FRN of almost $10 billion. The scheme was carried out by Process & Industrial Developments Limited ("P&ID"), a British Virgin Island shell entity with no technical capabilities, virtually no employees, and no demonstrable financial resources. P&ID directed the payment of hundreds of thousands of dollars of bribes and kickback payments to former FRN officials and employees to procure a two decades long, multi-billion dollar government contract to provide the FRN with a gas stripping plant along the Niger River Delta. In exchange for the bribes, the corrupted officials and employees of the FRN abandoned their duties to perform due diligence on P&ID's capabilities. In addition, P&ID

and the corrupted employees and officials of the FRN conspired to keep the contract and subsequent arbitration outside the normal approval and oversight chains within the government.

Had any genuine due diligence been performed and if the required governmental channels were followed, the FRN never would have entered into the agreement with P&ID.  The sole purpose of the agreement was to defraud the FRN of billions of dollars for services that P&ID never had the capacity or intent to perform.  P&ID never did any work on the project.  Instead, the only thing P&ID engineered was a fraudulent arbitration claim against the FRN which has resulted in a $6.6 billion arbitration award, which with interest is now purportedly valued near $10 billion.

Applicants recently discovered P&ID's fraudulent scheme and is still uncovering the full extent of the scheme and the breadth of the participants.  Applicants now bring this Application for the Court's assistance in procuring documents and information located within the Southern District of New York that will support Applicants' ongoing investigation and prosecutions in Nigeria.  Applicants intend to use the discovery material in the Nigerian Proceedings to prosecute individuals and entities that participated in or unlawfully benefited from P&ID's fraud.

The FRN's investigation to date has revealed that U.S. Dollars were the most prevalent currency used to pay the bribes in the FRN.  In addition, transactions in U.S. Dollars were utilized to launder money used to pay the bribes.  For example, P&ID's affiliates wired U.S. Dollars from their non-U.S. bank accounts to corrupted FRN officials' Nigerian bank accounts.  In addition, P&ID representatives gave corrupted Nigerian officials U.S. Dollars in cash in Nigeria.  When funds in U.S. Dollars are transferred from one foreign bank account to another, they generally pass through correspondent accounts in United States banks, mostly in New York.  Therefore, P&ID's unlawful bribes and money laundering in U.S. Dollars passed through United States banks.  Those

United States banks are therefore likely to have documents and information relevant to the FRN's ongoing investigation and prosecutions.

The FRN has identified Bank Respondents as likely to have either been utilized as correspondent banks to effectuate transfers of U.S. Dollars that were paid as bribes by P&ID and its affiliates or as United States branches of foreign financial institutions utilized by P&ID or its affiliates during the time they were carrying out the illicit scheme to defraud the FRN. Thus, Bank Respondents likely possess documents and information relevant to the Nigeria Proceedings, namely records of financial transactions by P&ID and its affiliated entities. The discovery sought in this Application will assist Applicants to effectively investigate and adjudicate criminal claims in the Nigeria Proceedings against the targeted individuals and entities.

Accordingly, Applicants request the Court's permission to issue a subpoena duces tecum to Bank Respondents to obtain discovery of financial records from P&ID, its known affiliate entities and their owners that Applicants believe will uncover further evidence of bribes and money laundering activity related to P&ID's scheme. As explained below, the Application satisfies the statutory requirements of Section 1782(a), and all relevant discretionary factors also weigh strongly in favor of an order granting the Application.

## STATEMENT OF FACTS

The massive breadth of the fraud perpetrated on the FRN demonstrates the need and appropriateness of the discovery Applicants seek through the Application under Section 1782. Applicants therefore describe below the details of the scheme known to date.[1]

---

[1] The following summary of P&ID's fraudulent scheme is offered to provide the Court with an overview of the corrupt practices the P&ID and its affiliates engaged in, including bribes paid to FRN officials. It is not an exhaustive list of the misdeeds by P&ID and its affiliates, their officers and directors or current and former Nigerian government officials. Nor is this summary intended to be a comprehensive presentation of the substantive evidence that FRN has uncovered to date. Applicants reserve all rights to bring additional charges in the Nigerian Proceedings.

A.  **The Gas Supply and Processing Agreement**

During the 2009-2010 time period, the FRN was in the midst of a constitutional crisis.  The FRN's then president, President Umaru Musa Yar'Adua, had been absent from office due to ill-health and in November 2009 was evacuated to Saudi Arabia to be treated for an acute heart condition.  *See* Declaration of Attorney General Abubakar Malami, executed on March 24, 2020 ("Malami Decl."),¶71.  He later returned to the FRN to recover, but he eventually succumbed to his condition and died in May 2010.  *Id*.  The presidency remained vacant after President Yar'Adua's leave to Saudi Arabia, and after months of political turmoil, in February 2010, then Vice-President Goodluck Jonathan was appointed by the FRN's senate to assume the role of President.  It was during this turbulent period of time, when the FRN was suffering from a temporary "power vacuum," that P&ID bribed and colluded with corrupt FRN government officials within the FRN's Ministry of Petroleum to force through the multi-billion dollar agreement for the supply and processing of natural gas in Nigeria..  *See* Malami Decl., ¶¶71-72.

1.  **P&ID Had No Ability or Intention To Perform The Gas Supply and Processing Agreement**

On January 11, 2010, while the FRN was without an official acting head of state, P&ID, a BVI shell entity, and the FRN (via the then corruption-plagued Ministry of Petroleum) entered into Gas Supply and Processing Agreement (the "GSPA"), a twenty-year arrangement for building and operating a gas-stripping plant along the Niger Delta in Nigeria. *See* Malami Decl., ¶¶82-86.

Pursuant to the terms of the GSPA, FRN was to supply natural gas ("Wet Gas") to P&ID via a government pipeline to the site of P&ID's production facility.  *See* Malami Decl., ¶83.   In turn, P&ID committed to constructing and operating a gas stripping plant to process the Wet Gas by removing the natural gas liquids ("NGL's") contained within it (which P&ID could retain for

its future use) and return to the FRN lean gas suitable for use for power generation. *Id*. at ¶85. As set out in Paragraph 2 of the GSPA, the alleged objective of the GSPA was:

> [T]o provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of [natural gas or Wet Gas] by the Government and the processing of said Wet Gas by P&ID … support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government … and to operate and maintain the facilities in an efficient manner.

*Id*. at ¶83 at Ex. 1, Paragraph 2.

As part of the GSPA, P&ID falsely represented that it "possess[ed] the requisite finance, technology and competence for the fast track development of the project" and that it had "undertaken all necessary studies, including the identification of suitable associated gas fields," to be able to "commence fast track development of the project" in accordance with the GSPA." *See* Malami Decl., ¶87 at Ex. 1. Contrary to these representations, P&ID had no apparent assets, no obvious industry experience, and no other credentials to suggest that it would be suitable to operate and carry out the type of sophisticated operation required under the GSPA. *Id*. at ¶¶5, 67.

During 2009 and 2010, the Ministry of Petroleum ministers had bifurcated leadership duties. *See* Malami Decl., ¶70. Dr. Rilwanu Lukman ("Dr. Lukman") was referred to as the "substantive Minister of Petroleum" and Odein Ajumogobia ("Mr. Ajumogobia") was referred to as the Minister for State.[2] *Id*. As the Substantive Minister, Dr. Lukman was in charge of petroleum, while Mr. Ajumogobia as the Minister for State was in charge of gas. *Id*. As the GSPA was a contract for a gas stripping plant, it fell within Mr. Ajumogobia's purview and should have been tendered to him for evaluation. *Id*.

---

[2] In Nigeria, a 'substantive' minister may be appointed alongside a junior minister to run the affairs of a Ministry. *See* Malami Decl., ¶70. Dr. Lukman served as the substantive Minister of Petroleum until March 17, 2010, when President Goodluck Jonathan dissolved his cabinet. Dr. Lukman died on July 21, 2014. *Id.* at ¶73.

However, in violation of his duties, Dr. Lukman usurped Mr. Ajumogobia's role, and, to Mr. Ajumogobia's exclusion, unilaterally executed the GSPA on behalf of the Ministry of Petroleum. *See* Malami Decl., ¶71.   Dr. Lukman's brazen and unauthorized acts were taken with virtually zero oversight or other participation by key required officials within the FRN and Ministry of Petroleum. *Id*. at ¶¶71-81   For example, in violation of the FRN's standard operating practices, the GSPA and P&ID were not referred to the National Petroleum Investment Management Services for scrutiny and due diligence. *Id*. at ¶¶80-81.   Indeed, Dr. Lukman's assistant, Taofiq Tijani (the recipient of several bribes from P&ID and its affiliate entities), later acknowledged that the GSPA was awarded to P&ID based on P&ID's "presentation to the Minister." *Id* at ¶75.   In November 2019, Mr. Tijani confirmed that no due diligence was conducted on P&ID's financial means to carry out its duties under the GSPA, that P&ID "did not show evidence of having any gas processing plant in the past," and that Dr. Lukman's purported authorization was based on vague assurances, such as that P&ID would "bring some engineers" to the project with prior experience. *Id*. at ¶77.

Having secured (through bribes) the support of corrupt former officials within the FRN, including Dr. Lukman and Mr. Tijani, on January 11, 2010, the GSPA was executed on behalf of the Ministry of Petroleum by Dr. Lukman in the presence of the Ministry of Petroleum's Legal Director, Grace Taiga –another recipient of P&ID's bribes – and Michael Quinn, who is now deceased, on behalf of P&ID. *See* Malami Decl., ¶82.   Although Ms. Taiga, as the Ministry of Petroleum's Legal Director, was charged with ensuring that the GSPA was entered into in full compliance with all extant laws and requirements – including the government approval processes discussed above – Ms. Taiga flouted her duties and actively concealed the GSPA from other government officials. *Id*. at ¶¶91-95.   Instead, in exchange for bribes, Ms. Taiga misrepresented

to both the Ministry of Petroleum and the Nigerian National Petroleum Corporation that the GSPA posed no financial risk to the FRN, and that the FRN would be entitled to fifty percent of profits. Ms. Taiga made these false representations despite receiving stark warnings from within the FRN that the GSPA was a dangerous "open-ended arrangement with grave consequences" with no termination provision. *Id*. at ¶95. However, in complete abdication of her legal duties, Ms. Taiga ignored the abundant red flags in favor of personal profits gained from P&ID's bribe payments.

### 2.   The GSPA Was Not Properly Authorized Under Nigerian Law

The FRN has a detailed protocol for the awarding of government contracts in order for them to be enforceable. *See* Malami Decl., ¶89.  This includes the GSPA. *Id*.  First, Nigerian law requires that foreign companies, like P&ID, obtain incorporation in Nigeria in order to be able to legally carry on business in Nigeria. *Id*. at ¶88.  Second, all contracts with a value higher than U.S. $2 million, were required to be authorized by the Bureau of Public Procurement. *Id*. at ¶89.  Third, contracts of the type (involving gas rights) and scope of the GSPA were required to have gone through a competitive bidding process. *Id.*  Fourth, as the GSPA involved the exploitation of the FRN's gas rights and provision of infrastructure, the agreement required the approval of the FRN's Federal Executive Council, which comprised of the President, the Vice President, and Ministers. *Id*.  None of the above necessary pre-conditions were satisfied (or attempted to be satisfied) prior to P&ID bribing its way to the GSPA.  *Id*.  In the absence of full compliance with the above conditions Nigerian law dictates that the GSPA is unenforceable. *Id*. at ¶90.

### B.   Discovery of P&ID's Bribes and Fraud

Given the size and duration of the GSPA, and the obviously suspicious circumstances surrounding a BVI shell company securing a massive unauthorized government contract under which performance was never attempted, in August 2018 the FRN's Economic and Financial

Crimes Commission ("EFCC"), opened an investigation into the GSPA, P&ID and individuals and entities connected to P&ID's fraudulent scheme. *See* Malami Decl., ¶225. The EFCC is a statutory body set up by the EFCC Establishment Act and vested with power to conduct investigations into whether any person, corporate body or organization has committed an offence under the Act or other laws of Nigeria relating to economic and financial matters. *Id*. at ¶156. Between June 2018 and July 2019, the EFCC undertook background intelligence and data analysis concerning the GSPA, including profiling associated companies and individuals, analyzing statements of account and interviewing the local director of P&ID (Nigeria). *Id*. at ¶171.

The EFCC's investigations have revealed corrupt practices by P&ID (and its affiliated entities) to individuals that were formerly within the Ministry of Petroleum. EFCC's investigations were aided by the turnover of financial records by Nigerian financial institutions that the EFCC has discovered were used to funnel P&ID's (and its related entities') bribes. For example, on August 26, 2019, bank statements for P&ID (Nigeria) were provided to the EFCC by Guaranty Trust Bank, a Nigerian financial institution. EFCC's review of P&ID (Nigeria)'s statements revealed large unexplained cash withdrawals and money transfers to its parent, *i.e.* P&ID, which transactions EFCC is continuing to investigate. *See* Malami Decl., ¶173.

The cash flows into and out of P&ID (Nigeria)'s accounts are not consistent with a legitimate operating company involved in a multi-billion dollar gas-processing contract such as the GSPA. They show a series of large, round payment transactions on P&ID (Nigeria)'s U.S. Dollar account with Guaranty Trust Bank from September 6, 2006 through March 14, 2011 (the period for which statements are available). In addition, twenty-seven percent of the deposits into and fifty-five percent of the withdrawals out of P&ID (Nigeria)'s Naira account were in cash,

which are predominantly withdrawals by Mr. Hitchcock in lump sums of between NGN 500,000 (appx. $1,362) to NGN 1,500,000 (appx. $4,086).  *See* Ex. 123 to Malami Decl., at pp. 54-55.

The cash withdrawals are not limited to P&ID, but also include affiliated companies such as Industrial Consultants (International) Limited ("ICIL"), Goidel Resources Limited, Lurgi Consult Limited ("Lurgi"), and over twenty other companies that EFCC has discovered are directly related to P&ID or its co-founders Michael Quinn (deceased), and Brendan Cahill. *See* Malami Decl.,  ¶177,  In addition, EFCC's investigations have revealed that P&ID (Nigeria) has at least twenty-eight associate companies registered in Nigeria, while P&ID has ten affiliated companies registered in tax havens around the world, including the British Virgin Island, and Cyprus.  *Id*. These companies made payments to FRN government employees involved in the negotiation of the GSPA. *Id*. at ¶ 177.  As detailed below, EFCC has directly connected P&ID bribe and kickback payments to several former government officials and employees, including two former officials from within the Ministry of Petroleum, Taofiq Tijani and Grace Taiga.  *Id*. at ¶¶182-193.

Taofiq Tijani was Dr. Lukman's Technical Assistant within the Ministry of Petroleum. Tijani has admitted that he received bribe payments from P&ID, including wire transfers and even a bag containing $50,000 in cash, from P&ID to turn a blind eye to P&ID's nonexistent infrastructure and comply with Dr. Lukman's directive to guide the P&ID to the GSPA.  *See* Malami Decl., ¶¶201-203.  In addition to this cash payment, Mr. Tijani also received wire transfers into his account held with Guaranty Trust Bank from P&ID affiliate, Lurgi.  *Id*. at ¶214.

The circumstances surrounding the $50,000 cash payment are particularly alarming.  In approximately April 2009, following P&ID's submission of its proposal to invest in gas development in the FRN, Tijani met with Dr. Lukman and P&ID directors Michael Quinn and Neil Hitchcock at the offices of the Ministry of Petroleum.  *See* Malami Decl., ¶201.  At this meeting,

Dr. Lukman (Tijani's boss) directed Tijani to "give [P&ID] all the necessary support in their proposals for the accelerated gas development project." *Id*. at ¶202. Later that night after a dinner attended by Tijani, Quinn, and Hitchcock, Hitchcock dropped a black bag with $50,000 in cash in Tijani's car, stating that it was a "gift" for his assisting P&ID. *Id*. at ¶203. In the ensuing years, Hitchcock transferred tens of thousands of dollars in, what can only be characterized as bribes to Tijani in exchange for the aid he provided to P&ID in procuring the GSPA. *Id*. at ¶¶214-215.

Tijani has cooperated with the FRN and has provided valuable evidence to the FRN of P&ID's fraudulent scheme. In a witness statement that he provided to the FRN, Tijani confirmed that when his Technical Team at the Ministry of Petroleum reviewed P&ID's proposal for the GSPA, they discovered that P&ID "did not have any past experience of gas development projects" and that there was "no strong evidence of financial capabilities," and that P&ID had failed to "secure[] the land location in the Calabar Cross-Rivers needed" for the GSPA project. *See* Malami Decl., ¶204. However, having received a $50,000 bribe from P&ID, along with the promise of more to come, Mr. Tijani admitted that he "deliberately overlooked all the shortcomings" and continued to provide P&ID with all the support it needed to procure the GSPA. *Id*. at ¶205.

In addition to receiving direct payments, Tijani has confirmed that P&ID and its affiliate entities made bribe payments to a Nigerian oil company named Conserve Oil Nigeria Limited ("Conserve Oil"). Tijani has confirmed that he, along with friends and family, have an ownership interest in Conserve Oil, and that he is a signatory on Conserve Oil's account held with Guaranty Trust Bank. *See* Malami Decl., ¶¶206-207. From 2013-2014, during the arbitration P&ID prosecuted against the FRN, P&ID's affiliate companies, paid Conserve Oil over $280,000. *Id*. at ¶207. The timing of these payments is particularly suspicious. For example, just two weeks after P&ID served its arbitration statement of claim, P&ID affiliate Lurgi paid Conserve Oil nearly

$55,000 (*Id*. at ¶207(a)), and shortly after the Petroleum Ministry failed to submit a timely statement of defense, Lurgi paid another $50,000 to Conserve Oil.  *Id*. at ¶207(b).  There is no evidence that Conserve Oil provided any services for these payments.  Moreover, Tijani has confirmed that at least $30,000 of payments made by P&ID affiliates to Conserve Oil were in actuality payments to Tijani for his assistance in procuring the GSPA for P&ID.  *Id*. at ¶207(c).

Grace Taiga was the Legal Director at the Ministry of Petroleum during Dr. Lukman's time as head of the Ministry of Petroleum.  In exchange for providing legal cover for P&ID, Ms. Taiga received over $20,000 in bribe payments from two P&ID affiliated companies, Eastwise Trading Limited and ICIL. *See* Malami Decl., ¶¶185-193.  As Taiga has never been employed by any of these entities, the only logical conclusion that can be drawn here is that payments were made to Taiga for her assistance in procuring the GSPA.  *Id*. at ¶¶191, 195.  Taiga completely shirked her duties as Legal Director, conducted no legal due diligence into P&ID, including whether P&ID had the financial resources or ability to comply with the GSPA in a satisfactory manner, and instead misrepresented that the GSPA posed no risk to the FRN.  *Id*. at ¶¶20, 91-95.

Notably, the only two committees within the Ministry of Petroleum that considered P&ID's proposal for the GSPA and P&ID's ability to perform under the GSPA were the Technical Committee (of which Tijani was a member) and the Legal Committee (of which Taiga chaired). *See* Malami Decl., ¶182.  In addition to the bribery payments to and malfeasance of these known subordinates of Dr. Lukman within the Ministry of Petroleum, the FRN has discovered that P&ID colluded with Dr. Lukman's associates to push the GSPA through with no genuine scrutiny.

While EFCC has not yet uncovered direct evidence of bribes paid to the deceased Dr. Lukman, EFCC is continuing its investigations into possible kickback agreements between Dr. Lukman and Alhaji Mohammad Kuchazi, a Commercial Director of P&ID, and a well-known

associate of Dr. Lukman.  *See* Malami Decl., ¶¶221, 223-224.  As part of the GSPA, and in exchange for Kuchazi's agreement to push the GSPA through his close associate Dr. Lukman, P&ID agreed to pay Kuchazi (via his entity, Kore Holdings Limited), three percent (3%) of P&ID's post-tax operating profits from the GSPA.  *Id*. at ¶224.  Dr. Lukman's direct role in unilaterally pushing the GSPA through, without complying with any of the FRN's established protocols for the awarding of contracts involving FRN gas resources, combined with the known bribes paid by P&ID to his subordinates, raise the high possibility that bribe payments were also made to Dr. Lukman.  *Id*. at ¶¶88-90, 204-205.  The discovery the FRN seeks through this application will help the FRN to confirm whether Dr. Lukman received payments from P&ID.  Given Dr. Lukman's position as Minister of Petroleum, this part of the investigation is critical to the FRN.

### C.  **The Sham London Arbitration**

Other than bribing former FRN officials and employees, P&ID does not seem to have done anything to further the GSPA and the project.  In fact, P&ID failed to undertake any work in furtherance of the GSPA.  *See* Malami Decl., ¶22, 97.  P&ID failed to secure the land required for the GSPA project and it never made the investments in human resources, assets or capital to undertake the construction and operation of a gas-stripping plant.  *Id*. at ¶97.  The only logical conclusion that can be drawn is that from the outset, P&ID's intent was to transform the GSPA into a claim against the FRN, which it could then attempt to enforce through arbitration.

Notwithstanding the illegal nature of the GSPA, and the fraudulent manner in which P&ID procured the GPSA, in August 2012 P&ID commenced arbitration proceedings against the FRN under the Nigerian Arbitration and Conciliation Act 2004 (the "Arbitration") seeking billions of dollars in damages for decades of speculative earnings.  *See* Malami Decl., ¶100.  Despite the high stakes of the Arbitration, and the suspicious circumstances surrounding the GSPA, the Ministry of

Petroleum was exclusively responsible for conducting the proceedings on the FRN's behalf even though as discussed above the Ministry of Petroleum was the biggest culprit (and greatest beneficiary within the FRN) of P&ID's GSPA fraud.  *Id*. at ¶¶26, 111, 144.

In August 2012, Dr. Lukman was no longer the Minister of Petroleum. *See* Malami Decl., ¶¶26, 43.  However, his successor, Ms. Diesani Alison-Madueke, was deeply corrupt, and her Ministry's flagrant mishandling of the Arbitration underscores the suspicious nature of the entire Arbitration. *Id*. at ¶¶24-31, 111-112.  As background, subsequent to her brief tenure as the Minister of Petroleum, Alison-Madueke was charged with numerous acts of corruption, including money laundering and bribery offenses committed as Minister of Petroleum.  The conclusion to be drawn here is that the Ministry of Petroleum was captive to a series of bribery schemes, including P&ID's, and from top down the Ministry of Petroleum actively failed to fulfill its charged duty to protect the FRN and its valuable natural resources.

The Arbitration was conducted in three phases – jurisdiction, liability, and damages.  *See* Malami Decl., ¶26.  Despite the high stakes of the Arbitration, the Attorney General at the time, Mr. Mohammed Bello Adoke ("Mr. Adoke"), who in 2019 was charged with facilitating a $1 billion bribery and fraud oil license scheme (with Mr. Adoke himself pocketing more than $800,000), hand-picked Nigeria's defense team.  *Id*. at ¶24.  Thereafter, the Arbitration was handled by the then Minister of Petroleum, Ms. Alison-Madueke, who herself has since been charged with numerous acts of corruption during her tenure as Minister of Petroleum,.  *Id*.

The Ministry of Justice assumed control of the FRN's defense at the damages phase.  *See* Malami Decl., ¶26.  The Ministry of Petroleum's handling of the FRN's defense at the jurisdiction and liability phases is notable for its suspicious failure to present any vigorous defense. *Id*. at ¶¶27-28.  For example, the Ministry of Petroleum, which had assumed the responsibility of presenting

the FRN's defense to jurisdiction and liability failed to adequately challenge the jurisdiction of the Arbitration in London and failed to timely assert any defense to liability or produce supporting documents or evidence to defeat P&ID's fraudulently procured GSPA. *Id*. at ¶¶114-118.

P&ID's "evidence," was limited to a single self-serving written witness statement from Michael Quinn, one of P&ID's co-founders, who, in 2006 was charged by the FRN with espionage and handling secret military materials. *See* Malami Decl., ¶¶28, 116. Quinn died shortly after issuing the statement. *Id*. at ¶28. Compounding its failure to present a timely defense, the compromised Ministry of Petroleum failed to seek cross-examination of any representative of P&ID, thereby allowing Quinn's self-serving statement about P&ID's financial resources, its purported expertise and infrastructure – all of which FRN's investigation has revealed to be nonexistent –left to stand unchallenged. *Id*. at ¶¶28, 116.

On damages, the Ministry of Petroleum handling the FRN's defense failed to present any competent evidence. *See* Malami Decl., ¶28. The Arbitration panel determined that the lone damages expert proffered by the FRN provided no relevant evidence and, as a result, the panel disregarded the FRN's witness testimony in its entirety. *Id*. Based on P&ID's falsified (yet uncontroverted) evidence, and the Ministry of Petroleum's blatant failure to lodge any meaningful defense, on January 31, 2017, the Arbitration culminated in a $6.6 billion award against the FRN (the "Award"). *Id*. at ¶29. With interest, P&ID claims that the outstanding balance due by the FRN to P&ID now exceeds $9.6 billion. *Id*.

The scale and potential devastating impact of this fraudulently obtained Award is illustrated by comparison to the FRN's key budget expenditures. P&ID's claimed award is nearly five times the FRN's 2019 budget for education ($2.07 billion), more than eight times the FRN's health budget for 2019 ($1.2 billion) and more than five times the FRN's counterterrorism budget

($1.9 billion), and is more than the FRN's entire gross foreign reserves.  *See* Malami Decl., ¶30. Enforcement of the Arbitration award against the FRN would devastate the Nigerian economy, and, ultimately, the Nigerian people.

### D.  Status of The Nigerian Proceedings

Armed with the above evidence of bribes paid by P&ID and affiliated entities to FRN government officials with oversight responsibilities concerning the GSPA, in September 2019, the EFCC commenced criminal proceedings against Taiga in the Federal High Court in Abuja, Nigeria.  *See* Malami Decl., ¶230.  Taiga was charged with several offenses, including tax avoidance, and failure to register illegal money laundering activities to the proper authorities.  *Id*. During her trial, which is ongoing, Taiga admitted that she provided no services for payments received from P&ID or its affiliated entities.  *Id*. at ¶195.  As for Tijani, he is cooperating with the EFCC and continues to give evidence to its investigators.  *Id*. at ¶¶212-213.

In addition to these individuals, criminal charges have been brought against P&ID, and several of its affiliates for money laundering or tax evasion.  *See* Malami Decl., ¶¶226-229, 232-238. Among the entities charged with facilitating bribes in connection with the GSPA is ICIL, which is owned by Mr. Quinn and Mr. Cahill, and Goidel, of which Mr. Nolan is a director.  *Id*. at ¶229.  Nolan and Quinn were also directors in P&ID, and Nolan was a signatory on P&ID's bank account.  *Id*. at ¶64. Nolan is currently on trial in Nigeria for money laundering and related offenses.  *Id*. at ¶229.  Michael Quinn's partner in P&ID, Cahill, is also at large.  *Id*. at ¶237.

As for P&ID and its subsidiary P&ID (Nigeria), both have been convicted by the Nigerian High Court of several offenses, including tax avoidance, failing to register the appropriate money laundering authorities, fraud, and acting without a license.  *See* Malami Decl., ¶¶181, 228.  On September 19, 2019, both P&ID entities plead guilty to criminal charges brought against them by

the EFCC. *Id*.  The Federal High Court of Nigeria ordered the winding up of both P&ID entities and ordered a forfeiture of their assets to the FRN.  *Id*. at ¶181.

The investigations by the EFCC and FRN are continuing, including into whether any additional current or former government employees, private individuals, and corporate entities that stood to be enriched by the GSPA or the Arbitration participated in P&ID's fraudulent scheme. *See* Malami Decl., ¶¶182, 206, 216-225.

**E.   <u>The Relief Applicants Seek From This Court</u>**

The discovery requested in the United States through this Application will aid the FRN's ongoing investigations and prosecutions of the numerous individuals and entities involved in the multi-billion dollar fraudulent scheme related to the GSPA and the ensuing Arbitration.  The evidence sought, as fully described in the attached set of discovery requests relates to documents, communications and records of individuals and entities that Applicants have identified as having materially participated in, and benefited from, the P&ID fraudulent scheme.

From Bank Respondents, Applicants seek discovery related to: (a) financial records from P&ID, its known affiliate entities, and their owners that Applicants believe will uncover further evidence of bribes and money laundering related to the GSPA scheme, including transactions between P&ID and its various affiliates and any recipients in the FRN; and (b) financial records revealing payments to FRN government employees and officials by P&ID, its owners and known affiliate entities, to further support the FRN's findings of rampant bribery and kickbacks made in connection with P&ID's GSPA scheme.   Applicants satisfy the statutory requirements of Section 1782, and, as the limited discovery that Applicants seek is directly targeted to the ongoing Nigerian Proceedings, the discretionary factors are satisfied as well.  For these reasons, the Court should

grant the Application in its entirety and authorize Applicants to issue the subpoena and discovery

requests attached to the accompanying declaration of Alexander D. Pencu, Esq. ("Pencu Decl.").

## ARGUMENT

### A.  The Requested Discovery Meets The Statutory Requirements Of Section 1782(a)

The goal of Section 1782 is to "make discovery of evidence for use in foreign litigation

simple and fair."  *In re Edelman*, 295 F.3d 171, 173 (2d Cir. 2002).   Section 1782(a) provides:

> The district court of the district in which a person resides or is found may order him to give
> his testimony or statement or to produce a document or other things for use in a proceeding
> in a foreign or international tribunal, including criminal investigations conducted before
> formal accusation.  The order may be made pursuant to …the application of any interested
> person and may direct that the testimony or statement be given, or the document or other
> thing be produced, before a person appointed by the court.

28 U.S.C. §1782(a).

Courts within this district regularly grant Section 1782 applications for discovery from

financial institutions in aid of foreign proceeding under similar circumstances.  *See In re Eurasian*

*Bank JSC*, 2020 WL 85226 *2 (Jan. 2, 2020, S.D.N.Y.) (authorizing the issuance of Section 1782

subpoenas against Citibank, JPMorgan and Deutsche Bank to obtain discovery for use in a criminal

investigation in Kazakhstan); *In re Iraq Telecom Ltd.*, 2019 WL 3798059 *5 (Aug. 13, 2019,

S.D.N.Y.) (authorizing Section 1782 subpoenas on Citibank and Standard Chartered in aid of the

applicant's  financial  fraud  action);  *Ahmad  Hamad  Algosaibi  &  Brothers  Co.  v.  Standard*

*Chartered Int'l (USA) Ltd. et al.*, 785 F.Supp.2d 434, 439 (S.D.N.Y. 2011) (granting Section 1782

subpoenas seeking customer financial records from Standard Chartered, Bank of America, HSBC

and Citibank in aid of a multi-billion dollar fraud action pending in Saudi Arabia).

Section 1782 requires Applicants to establish that "(1) the person from whom discovery is

sought resides or is found in the district of the district court to which the application is made, (2)

the discovery is for use in a proceeding before a foreign tribunal, which includes a criminal

investigation, and (3) the application is made by a foreign or international tribunal or 'any interested person.'" *In re Application of Chevron Corp.*, 709 F.Supp.2d 283, 290 (S.D.N.Y. 2010). Each requirement is satisfied in this Application.

First, Bank Respondents are financial institutions located in this district or have a systematic and continuous presence within this district for purposes of Section 1782. *See* Pencu Decl., ¶¶5-14. Applicants' investigation confirm that P&ID's money laundering and bribes were largely effectuated in U.S. Dollars such that correspondent bank accounts held at Bank Respondents were likely utilized in the unlawful transactions. *See* Malami Decl., ¶¶185-188, 198, 207-211, 217-218.

Second, the discovery sought in the Application is "for use" in aid of a foreign proceeding. The Second Circuit has taken an expansive view of the "for use" requirement of Section 1782, and has emphasized that "an applicant may seek discovery of any materials that can be made use of in the foreign proceeding to increase her chances of success." *Mees v. Buiter*, 793 F.3d 291, 299 (2d Cir. 2015). Thus, provided the discovery sought is "something that will be employed with some advantage or serve some use in the proceeding," then "an applicant may satisfy the statute's 'for use' requirement even if the discovery [it] seeks is not necessary for [it] to succeed in the foreign proceeding." *Id*. at 295, 298. The discovery Applicants seek is for use in criminal investigations by the EFCC and in criminal proceedings against target individuals and entities that participated in or benefitted from P&ID's fraud, which proceedings are currently pending before the Federal High Court of Nigeria. *See* Malami Decl., ¶241. The discovery sought in this Application will further support and establish that the individuals and entities targeted in the Nigerian Proceedings participated in the multi-billion dollar scheme to defraud the FRN. *Id*. at ¶¶242-243.

Moreover, the EFCC and Federal High Court of Nigeria both qualify as "foreign tribunals." The Federal High Court of Nigeria functions as a court of general jurisdiction over both criminal and civil matters.  Criminal proceedings pending before the Federal High Court of Nigeria qualify as a "foreign tribunal" under Section 1782, and courts have previously recognized the legitimacy of such proceedings for purposes of granting relief under Section 1782.  *See*, *In re Optimal Investment Services, S.A.*, 773 F.3d 456, 458 (2d Cir. 2014) (holding that Section 1782 "applies to a foreign criminal investigation involving an investigating magistrate seeking documents in the United States"); *see also In re Setraco Nigeria Ltd.*, 2013 WL 3153902 *2 (June 19, 2013 M.D. Fla.) ("Nigeria's civil and criminal courts qualify as 'foreign tribunals' under Section 1782").

As for the EFCC's pending investigations, the Supreme Court recognized in *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), that "Section 1782(a) does not limit the provision of judicial assistance to 'pending' adjudicative proceedings," but also includes "investigation[s] … of a criminal, civil, administrative, or other nature."  *Intel Corp.*, 542 U.S. at 258 (holding that the Commission of the European Communities charged with investigating alleged violations of the European Union's competition regulations qualified as a "foreign tribunal" under Section 1782).  Indeed, there is no requirement that an "adjudicative proceeding" be "pending" or "imminent," as Section 1782 "requires only that a dispositive ruling by the [investigating commission], reviewable by [the] courts, be within reasonable contemplation."  *Id*. at 259.  Moreover, the Second Circuit in *Mees*, interpreted *Intel* to mean merely that the materials sought should "be [for] us[e] at some stage of a foreign proceeding that was within reasonable contemplation at the time" of the application.  *Mees*, 793 F.3d at 301.  The EFCC's investigations into P&ID's fraud have provided the basis for numerous criminal proceedings, and convictions, against individuals and entities that participated in P&ID's bribery and kickback scheme.  *See*

Malami Decl., ¶¶33-35, 181-183, 228-232.   Undoubtedly, the valuable discovery sought in the Application will, insofar as the discovery further corroborates the FRN's evidence of P&ID's fraud, form the basis of future criminal proceedings.  *Id*. at ¶¶241-245.

Third, Applicants are interested parties under Section 1782.  The FRN, as a sovereign foreign nation seeking documents in aid of criminal investigations and prosecutions, is an "interested person" under the statute.  *See* 28 U.S.C. §1782 (an order for discovery under this section "may be made pursuant to … [a] request made by a foreign or international tribunal …."). Furthermore, an "Attorney General [of a foreign nation] is an 'interested person' within the meaning of section 1782," because the term "interested person" is "intended to include not only litigants before foreign or international tribunals, but also foreign and international officials as well as any other person whether he be designated by foreign law or international convention or merely possess a reasonable interest in obtaining the assistance."  *Young v. U.S. Dept. of Justice*, 1988 WL 131302 *7 (S.D.N.Y. Nov. 28, 1988) (JFK) (holding that the Attorney General of Bermuda, empowered by Bermudian law to "institute … criminal proceedings against any person … in respect of any offence [sic] against any law in force in Bermuda … is clearly an 'interested person' under section 1782."). By Section 174(1) of the Constitution of the Federal Republic of Nigeria, 1999, the Attorney General is empowered to institute and undertake criminal proceedings against any person before any court of law in Nigeria in respect of any offence created by an Act of the National Assembly of Nigeria.  Malami, as the Attorney General of the FRN, and chief legal officer charged with upholding and enforcing the FRN's laws, qualifies as an "interested person" under Section 1782 and is a proper applicant to request the discovery sought in the Application.  *Young*, 1988 WL 131302 at *7.

-20-

### B. __The Discretionary Factors Weigh In Favor Of Issuing Discovery__

Once all the elements of Section 1782(a) are met, requests for assistance should be liberally granted.  "[D]istrict courts must exercise their discretion under §1782 in light of the twin aims of the statute: providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts …." *In re Application for an Order Permitting Metallgesellschaft AG To Take Discovery*, 121 F.3d 77, 79 (2d. Cir. 1997).  Courts consider four factors in exercising their discretion to grant a Section 1782(a) application: (1) whether the person from whom discovery is sought is within the foreign court's jurisdiction; (2) the receptivity of the foreign tribunal to federal court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome.  *Intel Corp.*, 542 U.S. at 264-265.  Each of the discretionary *Intel* factors weighs in favor of granting the Application.

The first factor weighs in favor of granting the Application because Bank Respondents are not parties to the Nigeria Proceedings, are outside of the jurisdictional reach of the Nigerian courts, and evidence of bribes paid to current and former Nigerian officials may not be available absent the aid of Section 1782 aid.  *Intel Corp.*, 542 U.S. at 264.

The second factor weighs in favor of granting the Application because the FRN is receptive to receiving assistance from this Court in the form of discovery under Section 1782.  Under this factor, courts consider whether a clear policy in the foreign jurisdiction prohibits the use of discovery obtained in the United States, absent which, assistance under Section 1782 is appropriate.  *In re Euromepa S.A.*, 51 F.3d 1095, 1100 (2d Cir. 1995).  Nigerian criminal investigative commissions, such as the EFCC, and its courts, including the Federal High Court of Nigeria, are receptive to evidence obtained in a United States judicial proceeding, and no rules or

policies exist within the FRN prohibiting their use by the FRN courts, investigators, or prosecutors. *See* Malami Decl., ¶¶241-245; *see also In re Setraco Nigeria Ltd.*, 2013 WL 3153902 *2.

The third factor weighs in favor of granting the Application because Applicants do not seek to circumvent investigatory restrictions in the FRN.  Under the third factor, courts consider whether there are any restrictions under the law of the foreign tribunal against the collection of evidence abroad.  *See In re OOO Promnefstroy*, Misc. No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Sep. 15, 2009).  However, "nothing in the text of [Section] 1782 limits a district court's production-order authority to materials that could be discovered in the foreign jurisdiction if the materials were located there."  *Intel Corp.*, 542 U.S. at 260-263.  The appropriate inquiry under this third *Intel* factor is whether the Applicants are pursuing Section 1782 discovery in good faith. *See In re Hansainvest Hanseatische Investment-GmbH*, 364 F.Supp.2d 243, 251 (S.D.N.Y. 2018) ("to demonstrate circumvention, Respondents must illustrate … that Applicants are engaged in a bad faith endeavor to misuse Section 1782").  Nigerian law permits the type of discovery requested in the Application.  *See* Malami Decl., ¶¶241-245.  Applicants in good faith  seek permission to obtain limited discovery directly related to the core issues arising out of the Nigerian Proceedings, including financial records of individuals and entities that Applicants are investigating and prosecuting for committing, or aiding in the commission of, a multi-billion fraud on the FRN.  *Id*.

The fourth *Intel* factor weighs in favor of granting the Application because the discovery requested is not unduly burdensome or intrusive.  Courts permit discovery under Section 1782 from financial institutions that could have documents or information relevant to the foreign proceeding.  *See*, *e.g., In re Aso*, 2019 WL 2345443 *8 (June 3, 2019, S.D.N.Y.) (JLT) (granting the applicant's request for financial records from five financial institutions, including Citibank, across twenty-two years, and finding that the requests were sufficiently narrowly tailored where

the applicant presented "plausible" information that the requested information "could uncover information" relevant to the foreign proceeding).  Moreover, Bank Respondents need not be the only potential source of the information sought under this factor.  *See In re Iraq Telecom*, 2019 WL 3798059 *5 ("[w]hile it is possible that documents related to use of the correspondent bank … may ultimately be unnecessary to prove Petitioner's claims, issues of potential overbreadth are different from whether… producing the documents is unduly burdensome or intrusive").

The purpose of the discovery is to assist the Applicants in the Nigerian Proceedings.  *See* Malami Decl., ¶¶241-245.  Bank Respondents have been identified as likely to have relevant information because they act as correspondent banks for foreign banks that were utilized by P&ID and its affiliates to pay bribes or are New York offices of foreign institutions used by P&ID and its affiliates.  Foreign transactions in U.S. Dollars generally clear through New York.  *See In re Sealed Case*, 932 F.3d 915, 920 (D.C. Cir. 2019).   U.S. Dollar currency clearing is handled by Fedwire, which is run by the twelve Federal Reserve banks, and the Clearing House Interbank Payment System ("CHIPS"), which is owned by member banks. There are approximately fifty member banks that participate in CHIPS.  *See* Ex. 11 to Pencu Decl.[3]

Applicants have analyzed the information gathered in the Nigerian Proceedings to identify the United States financial institutions that would be most likely to have effectuated U.S. Dollar transactions connected to P&ID's bribery and money laundering scheme.   Five of Bank Respondents, namely Citibank, Deutsche Bank, HSBC, JP Morgan, and Standard Chartered are members of CHIPS.  *See* Ex. 11 to Pencu Decl.  Fortis' parent, BNP Paribas, is a member of CHIPS.  *Id*.  Allied Irish, Bank of Cyprus, UBA, and Standard New York are not members of CHIPS but are the New York affiliates of foreign institutions used by P&ID and its affiliates.

---

[3] https://www.theclearinghouse.org/-/media/new/tch/documents/payment-systems/chips_participants_revised_02-07-2020.pdf

Given the prevalence of U.S. Dollars in P&ID's scheme, and based on Bank Respondents either being used as correspondent banks to effectuate U.S. Dollar transfers for P&ID or its affiliates or as the New York offices of foreign institutions used by P&ID and its affiliates, Applicants have identified Bank Respondents as likely to have relevant information to the U.S. Dollar bribes paid by P&ID in Nigeria.

In order to comply with their Anti-Money Laundering ("AML") and Anti-Terrorist Financing ("ATF") obligations, Bank Respondents that effectuated transactions should have obtained information and supporting documentation from the foreign banks about, *inter alia*, the following: (1) key details about the transfer(s) such as date, currency, names of sending/receiving banks, relevant account numbers, and other information relating to the flow of funds between various parties; (2) the purpose of the transfer(s); and (3) the beneficial owners of the sending/receiving accounts. *See*, *e.g.*, 31 U.S.C. § 5318(i) (requiring covered banks to "establish appropriate, specific, and, where necessary, enhanced, due diligence policies, procedures, and controls that are reasonably designed to detect and report instances of money laundering through [the foreign bank account]"); *see also* 31 C.F.R. § 1010.610(a) (describing the required due diligence program as including "[a]ssessing the money laundering risk presented by such correspondent account, based on a consideration of all relevant factors" and "[a]pplying risk-based procedures and controls to each such correspondent account reasonably designed to detect and report known or suspected money laundering activity, including a periodic review of the correspondent account activity sufficient to determine consistency with information obtained about the type, purpose, and anticipated activity of the account").[4] Applicants seek the information Bank Respondents should have compiled pursuant to their AML and ATF obligations.

---

[4] Additionally, if the Bank Respondents determined that the foreign banks or recipients were money laundering risks, they should have applied enhanced due diligence procedures including (1) "[m]onitoring transactions to, from, or

Applicants' discovery requests are limited to transactions of a targeted group of persons and entities over a ten-year period during which P&ID carried out its scheme. *See* Malami Decl., ¶¶241-245. As Applicants' discovery requests are narrowly limited in scope and time, and specifically targeted at gathering evidence for use in the Nigerian Proceedings, the granting of this application and permitting limited discovery is not unduly intrusive or burdensome. Therefore, the fourth factor also weighs in favor of granting the Application.

## <u>CONCLUSION</u>

Federal law authorizes this Court, pursuant to Section 1782(a), to grant discovery in aid of a foreign proceeding. The Applicants' requests fit squarely within the goal of Section 1782(a) to provide equitable and efficient means to assist parties engaged in legal proceedings abroad. As the statutory requirements of Section 1782 are satisfied and the discretionary factors weigh in favor of granting this Application the Court should grant the Applicants' request for discovery.

Dated: March 25, 2020
    New York, New York

**MEISTER SEELIG & FEIN LLP**

By:  */s/ Alexander D. Pencu*
        Alexander D. Pencu, Esq.
        Christopher J. Major, Esq.
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500
Email: adp@msf-law.com
        cjm@msf-law.com

*Attorneys for Applicants Federal Republic of Nigeria, and Attorney General Abubakar Malami*

---

through the correspondent account in a manner reasonably designed to detect money laundering and suspicious activity"; and (2) "[o]btaining information from the foreign bank about the identity of any person with authority to direct transactions through any correspondent account that is a payable-through account, and the sources and beneficial owner of funds or other assets in the payable-through account." 31 C.F.R. §§ 1010.610(b)(1)(i), (iii).