UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE:<br><br>EX PARTE APPLICATION OF THE FEDERAL REPUBLIC OF NIGERIA and ABUBAKAR MALAMI, THE ATTORNEY GENERAL OF THE FEDERAL REPUBLIC OF NIGERIA<br><br>Applicants. | Case No: 1:20-mc-169 |

---

**DECLARATION OF THE HONORABLE ABUBAKAR MALAMI
IN SUPPORT OF APPLICANTS' 28 U.S.C. §1782(a) APPLICATION**

---

**MEISTER SEELIG & FEIN LLP**
125 Park Avenue, 7th Floor
New York, NY 10017
Tel: (212) 655-3500

*Attorneys for Applicants the Federal Republic of Nigeria and the Honorable Abubakar Malami, the Attorney General of the Federation and Minister of Justice of the Federal Republic of Nigeria*

I, the Honorable Abubakar Malami, Attorney General of the Federal Republic of Nigeria, declare under penalty of perjury under the laws of the United States:

## INTRODUCTION

1.      I am the Attorney General of the Federation and Minister of Justice of Nigeria, having been appointed by President Muhammadu Buhari on November 11, 2015, and reappointed by President Buhari on August 21, 2019.

2.      I respectfully submit this Declaration in support of the Federal Republic of Nigeria's ("Nigeria") application under 28 U.S.C. § 1782 for an order directing the respondents to provide discovery in the form of documents and deposition testimony that is relevant to investigations and prosecutions pending in Nigeria.

3.      I make this Declaration based upon my personal knowledge learned through my review of documents and information provided to me in my capacity as the Attorney General of Nigeria in connection with our ongoing investigation into the ongoing fraudulent scheme described below, which has been perpetrated against Nigeria for the last decade.

4.      My Declaration is supported by numerous exhibits, a true and correct copy of which are attached hereto and cited herein as "**Ex.    .**" Schedule A hereto contains an index of the Exhibits to this Declaration, including a description of each document.

## SUMMARY OF BACKGROUND FACTS AND THE FOREIGN PROCEEDINGS

5.      As detailed below, Nigeria's investigation to date has revealed that an entity known as Process & Industrial Developments Limited ("P&ID"), a British Virgin Islands company with no apparent infrastructure or other assets, virtually no employees, no appropriate credentials and no track record secured a massive Gas Supply and Processing Agreement (the

1

"GSPA") with the Ministry of Petroleum Resources of the Federal Republic of Nigeria (the "Petroleum Ministry") on January 11, 2010. **See Ex. 1**.

6. Unfortunately, Nigeria has a long history of endemic government corruption under previous regimes, often involving the payment of bribes to government employees and officials in exchange for foreign businesspeople procuring lucrative contracts with Nigeria. The scheme conceived and executed by P&ID was particularly brazen and detrimental to the Nigerian people, because P&ID used the bribes to procure the GSPA which it had no ability or intention of ever performing.

7. The evidence uncovered to date shows that a number of government employees who were directly involved in the appointment of P&ID as a contractor, and the conclusion of the GSPA, received fraudulent payments in the form of bribes. As I shall explain below, there is good reason to believe that Ministers at the highest level were involved in a corrupt scheme to steal money from Nigeria by entering into the GSPA and failing properly to defend the subsequent arbitral proceedings.

8. Recently discovered evidence demonstrates that the GSPA was a sham agreement procured by fraud, including:

- P&ID would never have been able to perform the GSPA;

- Dr. Rilwanu Lukman ("Dr. Lukman"), the then Minister of Petroleum, must have been involved in the sham given that he, with the connivance of Grace Taiga ("Ms. Taiga"), who I describe below, wrongfully withheld the GSPA from the usual channels of Government scrutiny required by law;

- At least two government employees involved in the negotiation of the GSPA received bribes from companies associated with P&ID, while another close associate of Dr. Lukman has admitted that he entered into an agreement with P&ID's principals whereby he would receive a 3% commission on profits from the project in return for "facilitating meetings" with Government officials;

- Michael Quinn ("Mr. Quinn"), the Chairman of P&ID, gave false evidence to the arbitral tribunal about the ability and readiness of P&ID to perform the GSPA;

- P&ID (and its Nigerian subsidiary) were operating 'under the radar' in Nigeria, without obtaining the necessary licenses and registering with the required authorities; and

- A number of large, unexplained payments were made into and out of the bank account of P&ID's associated companies, in particular P&ID (Nigeria) and Industrial Consultants (Nigeria) Limited, and Eastwise Trading Limited ("Eastwise"), as conduit bribe payments made by P&ID and its agents to corrupt Nigerian Government officials responsible for awarding the GSPA and subsequently "managing" the arbitration between P&ID and the Republic of Nigeria.

9.     The principals of P&ID at the time of the GSPA were Mr. Quinn (now deceased) and Brendan Cahill ("Mr. Cahill"), Irish nationals who have been associated with corruption in Nigeria in the past.

10.     P&ID is now owned by Lismore Capital Limited ("Lismore Capital"), a Cayman Islands company and VR Advisory Services, Limited ("VR Advisory Services"), a Cayman Islands Company based in New York.

11.     The GSPA provided for P&ID to construct and operate a gas stripping plant in Nigeria over a twenty-year term.  Pursuant to the GSPA, Nigeria was required to supply gas to P&ID, to provide the necessary infrastructure and arrangements with third parties to ensure the supply and delivery of gas, and assist P&ID in obtaining permits, licenses, and approvals needed for the project.  The GSPA obligated P&ID to construct and operate the facilities necessary to process the wet gas by removing the natural gas liquids and returning to Nigeria lean gas suitable for use in power generation or other purposes.

12.     The GSPA was not considered or approved within the proper channels of the Federal Republic of Nigeria.  For example, despite its massive financial and temporal scale, the GSPA was not approved by any government department except the Petroleum Ministry.  At the

time of the GSPA, the Petroleum Ministry had bifurcated duties, with the "substantive Minister of Petroleum," Dr. Lukman being in charge of petroleum, while the "Minister for State," Odein Ajumogobia, was in charge of gas. Yet, the GSPA – an agreement to operate a gas stripping plant – was executed by Dr. Lukman, the substantive Minister of Petroleum.

13.     Dr. Lukman died in 2014.  Nigeria is continuing to investigate potential personal benefits bestowed upon Dr. Lukman in exchange for the GSPA.  Nigeria has, however, already developed compelling documentary evidence that the subordinates Dr. Lukman directed to assist P&ID with respect to the GSPA did receive bribes from P&ID and its affiliates.

14.     Taofiq Tijani ("Mr. Tijani"), Dr. Lukman's Technical Assistant within the Ministry of Petroleum, has stated that Dr. Lukman directed him to support P&ID's proposal for the project.

15.     Mr. Tijani admits now that he was repeatedly bribed by P&ID, including wire transfers and $50,000 in cash given to him in a black bag by a P&ID employee following a dinner.

16.     In a recent witness statement by Mr. Tijani, he conceded that as Chairman of the Technical Committee tasked by Dr. Lukman to review the proposals for the GSPA Mr. Tijani deliberately overlooked all the shortcomings of P&ID in order to comply with Dr. Lukman's directive that he support P&ID for the project.

17.     Another top official within the Petroleum Ministry while Dr. Lukman was in charge was Legal Director Ms. Taiga.  Ms. Taiga also received several bribes from P&ID and its affiliates.  In September 2019, Ms. Taiga was charged with a series of offenses under Nigerian law, including receiving bribes in violation of the Corrupt Practices and other Related Offenses Act of 2000.

18.     It appears that only two committees within the Petroleum Ministry considered P&ID's proposal for the GSPA and its ability to perform the anticipated obligations of the contractor for the project.  These two committees were the Technical Committee, on which Mr. Tijani was a member, and the Legal Committee, which Ms. Taiga chaired.

19.     However, Mr. Tijani has now admitted that he did not undertake any genuine due diligence on the feasibility of the alleged project or P&ID's ability to complete it in a satisfactory manner, even though Mr. Tijani concedes that P&ID presented no evidence of having the financial wherewithal for completing such a project or the track record to establish it had the technological skills and knowledge to perform.

20.     In addition, Ms. Taiga failed to carry out her duties to vet the GSPA from a legal standpoint to ensure it was properly authorized within the Nigerian Government or that the GSPA was drafted in a way to protect Nigeria's interest.  Ms. Taiga did no legal due diligence. Instead, she misrepresented that the GSPA posed no risk to Nigeria and took no steps to protect Nigeria's rights in the GSPA.

21.     Alhaji Mohammad Kuchazi ("Mr. Kuchazi"), a Commercial Director of P&ID, was a well-known associate of Minister of Petroleum Dr. Lukman.   Mr. Kuchazi had an agreement with P&ID, whereby P&ID would pay Kuchazi through his entity, Kore Holdings Limited ("Kore Holdings"), three percent (3%) of its post-tax operating profits from the GSPA for facilitating meetings with government officials.  In 2014, P&ID wrote to a third-party creditor of Mr. Kuchazi confirming that Mr. Kuchazi's entity would be receiving at least $5 million through Kore Holdings as part of his side-agreement with P&ID.

22.     No work was performed on the project by P&ID.

23.     On May 10, 2012 P&ID asserted that Nigeria was in breach, and P&ID commenced an arbitration in London against the Petroleum Ministry on August 22, 2012 (the "Arbitration") seeking billions of dollars of damages despite having done nothing to advance the project.

24.     Despite the high stakes of the Arbitration, the Attorney General at the time, Mr. Mohammed Bello Adoke ("Mr. Adoke"), who in 2019 was charged with facilitating a $1 billion bribery and fraud oil license scheme (with Mr. Adoke himself pocketing more than $800,000), **See Ex. 116**, hand-picked Nigeria's defense team.  Thereafter, the Arbitration was handled by the then Minister of Petroleum, Ms. Diezani Alison-Madueke ("Ms. Alison-Madueke"), who herself has since been charged with numerous acts of corruption during her tenure as Minister of Petroleum, including money laundering and bribery offenses.  Ms. Alison-Madueke's corruption has been prominently featured in *U.S. v. The M/Y Galactica Star*, 4:17-cv-02166 (S.D. Tex.) (Houston Div.).  **See Ex. 2**.     Recent investigations have confirmed that throughout the Arbitration neither Mr. Adoke nor the Petroleum Ministry provided proper direction to legal counsel.

25.     As is evident, from the inception of the GSPA, through the Arbitration, Nigeria's interests were subordinated to the interests of corrupt government officials who lined their pockets with bribes from companies such as P&ID, who literally delivered bags of cash to corrupt officials to procure the GSPA.

26.     The Arbitration was conducted in three phases – jurisdiction, liability, and damages – with Nigeria losing all three phases.  The Petroleum Ministry, led by Ms. Alison-Madueke, controlled Nigeria's day to day handling of the case through the liability award.  The Ministry of Justice finally took over during the damages phase.

27.     The "defense" to the Arbitration by Nigeria was suspiciously thin.  For example, despite contesting jurisdiction over the arbitration in London, Nigeria's counsel was apparently unable to obtain instructions from Nigeria to assert the challenge.  Moreover, Nigeria failed to timely assert any defense to liability, and even after it did Nigeria failed to timely produce supporting documents and other evidence.

28.     Unbelievably, P&ID rested its entire case on a self-serving written witness statement from Mr. Quinn who died shortly after issuing it, and yet Nigeria never sought to cross examine any representatives of P&ID instead permitting Mr. Quinn's statement on Nigeria's liability to stand effectively unchallenged.  On damages, it was found Nigeria' lone witness – an expert – offered no relevant evidence and was disregarded.  In sum, the defense to a case with the potential to devastate Nigeria was kept within a small group of the Petroleum Ministry for years, and Nigeria did not present a vigorous defense despite the suspicious circumstances surrounding the GSPA.

29.     The Arbitration culminated in a $6.6 billion (USD) award against Nigeria on January 31, 2017.  With interest, P&ID claims that the outstanding balance due by Nigeria to P&ID now exceeds $9.6 billion.

30.     The amount awarded to P&ID with interest is nearly five times Nigeria's 2019 budget for education, which is $2.07 billion, is more than eight times Nigeria's health budget for 2019, which is $1.2 billion, is more than five times Nigeria's counterterrorism budget, which is approximately $1.9 billion, and is more than Nigeria's gross foreign reserves.

31.     Given the massive size of the award, the disastrous ramifications for Nigeria, and the obviously suspicious circumstances surrounding a BVI shell company securing a massive unauthorized government contract under which performance was never attempted, but which

somehow yielded one of the largest arbitration awards in history, and at the direction of Vice-President Yemi Osinbajo, who expressed his conclusion that the GSPA and Arbitration amounted "to a fraud on the nation," (**See Ex. 117**) and the instructions of Chief of Staff to President, Abba Kyari that I "urgently review the lapses in the [GSPA] with P&ID, which led to the [Final Award]" (**See Ex. 118**, at ¶I(g)) I directed Nigerian Economic and Financial Crimes Commission (the "EFCC") to commence an investigation into the circumstances surrounding the GSPA and Arbitration. **See Ex. 119**.

32.     On August 20, 2019, the Solicitor General of the Federation wrote to the Nigeria Police Force to broaden the investigation to include actions carried out by individuals, corporate entities, and government employees that led to the formation of the GSPA. **See Ex. 88**.

33.     To date, Nigeria's investigation has uncovered concrete evidence of bribes paid by P&ID and affiliated entities to Nigerian government officials with oversight responsibilities concerning the GSPA.  P&ID and its subsidiary P&ID (Nigeria) have been convicted by the Nigerian High Court of several offenses, including tax avoidance, failing to register the appropriate money laundering authorities, fraud, and acting without a license.  Ms. Taiga's trial in Nigeria is ongoing.  Mr. Tijani is cooperating with the investigation and continues to make statements to the investigators.  Six affiliates of P&ID have been charged with money laundering or tax evasion.  Among the entities charged with facilitating bribes in connection with the GSPA is Lurgi Consults Nigeria Limited ("Lurgi"), which is owned by James Nolan and Mr. Quinn's son, Adam Quinn. **See Ex. 21(a)**, at Page 13 – Page 14.

34.     Messrs. Nolan and Quinn are also directors in P&ID, and James Nolan was also a signatory on P&ID's bank account.  James Nolan is currently on trial in Nigeria for money laundering and related offenses.

35.     On December 18, 2019, the Federal High Court of Nigeria issued an arrest warrant for Adam Quinn, to face multiple charges of money laundering in connection with the GSPA. Both he and Mr. Quinn's partner in P&ID, Mr. Cahill, remain at large.

36.     Mr. Adoke, who was the Attorney General during the arbitration, was arrested on December 19, 2019, for abuse of office and money laundering concerning a separate government contract.

37.     Nigeria's investigations are continuing, including into whether any additional current or former government employees, private individuals, and corporate entities that stood to be enriched by the GSPA or the Arbitration participated in the fraudulent scheme.

38.     The discovery requested in the United States through this application will aid Nigeria's ongoing investigations and prosecutions of the numerous individuals and entities involved in the multi-billion dollar fraudulent scheme related to the GSPA and the ensuing arbitration.

## DETAILED STATEMENT OF FACTS IN SUPPORT OF APPLICATION

### I.     The Relevant Nigerian Government Officials and Government Employees

39.     President Umaru Yar'Adua, who served from May 2007 until his death following a long illness in May 2010, was in power at the time the GSPA was executed.  President Yar'Adua was replaced by President Goodluck Jonathan, who served from May 2010 until the election of the current President of Nigeria, President Muhammadu Buhari.

40.     The Minister of Petroleum who executed the GSPA was Dr. Lukman.  Dr. Lukman remained in office until March 17, 2010 when President Goodluck Jonathan dissolved his cabinet.

41.     The Legal Director for the Petroleum Ministry at the time the GSPA was executed was Ms. Taiga. Ms. Taiga also served on the Petroleum Ministry's Legal Committee, which was tasked with reviewing the GSPA from a legal perspective.

42.     Mr. Tijani was the Senior Special Assistant to Dr. Lukman, and the chairman of the Technical Committee, which was tasked with reviewing the GSPA from a technical perspective.

43.     Dr. Lukman was succeeded by Ms. Alison-Madueke, who served from April 6, 2010 until May 28, 2015.

44.     Mr. Ibrahim Dikko served as legal advisor to the Petroleum Ministry during the Arbitration.

45.     President Buhari succeeded Ms. Alison-Madueke as Minister of Petroleum on November 11, 2015, and serves jointly as President and Minister of Petroleum, as is his Constitutional prerogative.

46.     As detailed above, Mr. Adoke served as the Attorney General of the Federation and Minister of Justice of Nigeria from April 6, 2010 to May 29, 2015.

47.     I was sworn in as the Attorney General of the Federation and Minister of Justice of Nigeria on November 11, 2015, and have been in the office since that date.

**II.    The P&ID Principals, Employees, and Affiliates**

48.     Mr. Michael Quinn was an Irish national who was a former apprentice motor mechanic and music band manager in Dublin, Ireland. Mr. Quinn later operated as a key fixer and go-between in the Nigerian oil industry during successive military governments over a generation, during which time he sold military hardware, ammunition, and combat aircraft. **See Ex. 3** at pp. 4, 6-10.

49.     In 2006, Mr. Quinn and seven others, including his son Adam Quinn, were charged in Nigeria with espionage and handling secret military materials.  Mr. Quinn died in February 2015.  **See Ex. 3**, at p. 10; **Ex. 4**.

50.     Mr. Brendan Cahill is an Irish national, who is an accountant based in Dublin, Ireland.

51.     Messrs. Quinn and Cahill were longtime business partners.  **See Ex. 3**, at pp. 5-7, **Ex. 21(a)**, at Page 13.[1]

52.     Messrs. Quinn and Cahill formed P&ID in the British Virgin Islands in 2006.  **See Ex. 5**, at ¶17.

53.     P&ID holds itself out as an engineering and project management company.  **See Ex. 6**, at ¶ 4.

54.     On July 21, 2006, Messrs. Quinn and Cahill also incorporated Process and Industrial Developments (Nigeria) Limited ("P&ID (Nigeria)") in Nigeria, with a registered office in Lagos.  **See Ex. 121**.

55.     In August 2006, P&ID (Nigeria) opened a bank account with Guaranty Trust Bank plc ("Guaranty Trust Bank").  In the application for the account, Neil Hitchcock ("Mr. Hitchcock") and James Nolan ("Mr. Nolan") were named as the key contacts, describing themselves respectively as a "Project Director" and "Marketing Executive" for P&ID (Nigeria).  **See Ex. 122**. The application also contained the minutes of a meeting of the nominee directors of P&ID (Nigeria), Adamu Usman and Jadesola Awoyinfa, dated August 7, 2006, pursuant to

---

[1] Exhibits that end in (a), ex. **Ex. 21(a)**, refer to transcriptions of written statements provided to the Nigerian Economic and Financial Crimes Commission, or the Nigerian police.  References to "Page" in the transcribed witness statements refer to the corresponding page of the original handwritten witness statements.  For example, **Ex. 21(a)**, at Page 13, is a reference to the section of the document labeled "Page 13," which is Page 13 of the original handwritten witness statement included herein as **Ex. 21**.

which Mr. Hitchcock and Mr. Nolan were authorized to operate and verify the accounts of the company. **See Ex. 122**, at p. 13.

56.     P&ID does not appear to have any fulltime employees.

57.     According to lobbying filings in the United States, P&ID is seventy-five percent (75%) owned by Lismore Capital, a company registered in the Cayman Islands, and the remaining twenty-five percent (25%) is owned by VR Advisory Services. **See Ex. 7**.

58.     Mr. Hitchcock was formerly an employee of P&ID. **See Ex. 8(a)**, at p. 4. In April 2009, while P&ID was pursuing the gas stripping plant project with the Petroleum Ministry, Mr. Hitchcock dropped a black bag containing $50,000 (U.S.) in Mr. Tijani's car after Messrs. Quinn, Hitchcock, and Tijani had dinner together. **See Ex. 9(a)**, at Page 5. Mr. Hitchcock is deceased.

59.     Mr. Alhaji Muhammad Kuchazi is a Commercial Director of P&ID. **See Ex. 8(a)**, at Page 6. He was a close associate of the late Dr. Lukman, the Minister of Petroleum who executed the GSPA.

60.     Mr. Kuchazi is the principal of an entity known as Kore Holdings. P&ID and Kore Holdings entered into an agreement whereby P&ID agreed to share three percent (3%) of its after-tax profits with Kore Holdings in exchange for Kore Holdings providing P&ID access to Nigerian government officials. **See Ex. 8(a)**, at Page 5-Page 6; **Ex. 10**.

61.     Eastwise is a Cayman Island limited company (**See Ex. 17**) with an office address at 16 Stephen's Lane, Dublin, Ireland. Mr. Cahill operates Eastwise and used it to pay bribes to Ms. Taiga and Mr. Tijani as well as in P&ID's attempt to cover up payments made by P&ID to Ms. Taiga. **See Ex. 11(a)**, at Page 2, **Ex. 12**, **Ex. 13**, at Page 1.

62.      Industrial Consultants (International) Limited ("ICIL"), is an Irish limited company with an address at 16 Stephen's Lane, Dublin, Ireland.  Messrs. Quinn and Cahill formed ICIL in 1979.  **See Ex. 16**.  Messrs. Quinn and Cahill were its shareholders, and until recently Anita Quinn (Michael Quinn's wife) was listed as a Director of ICIL.  **See Ex. 15**.  Mr. Cahill is the Secretary.  **See Ex. 16**.  P&ID used ICIL to pay bribes to Ms. Taiga and Mr. Tijani.

63.      Lurgi was a limited company registered in Cyprus and located in Nigeria.  James Nolan and Adam Quinn are the directors and owners of Lurgi.  **See Ex. 19**.  P&ID used Lurgi to pay bribes, including to Mr. Tijani.  **See Ex. 98**.

64.      Mr. Nolan is a director and shareholder of Lurgi.  **See Ex. 19.**  Mr. Nolan is also a Director of P&ID (Nigeria), Goidel Resources Limited, and ICIL Nigeria Limited.  **See Ex. 21(a),** at Page 5- Page 6.  Mr. Nolan is a signatory on P&ID's bank account.  **See Ex. 21(a)**, at Page 6.

65.      Adam Quinn is a director and shareholder of Lurgi.  **See Ex. 19**.  Adam Quinn is also a Director of P&ID (Nigeria), Goidel Resources Limited, and ICIL Nigeria Limited.

66.      Goidel Resources Limited ("Goidel") is an entity controlled by Messrs. Nolan and Quinn, who are Goidel's Directors.

### III.    The Formation and Content of the GSPA

67.      The GSPA concerns a twenty-year arrangement for building and operating a gas-stripping plant in Nigeria.  Yet it was entered into with a British Virgin Islands company, P&ID, with no apparent assets, no obvious industry experience, and no other credentials to suggest that it would be suitable to operate and carry out such a sophisticated project.

68.      It appears from minutes of meetings that the negotiations for the GSPA were conducted by Messrs. Quinn, Kuchazi and Hitchcock.  **See Ex. 22**.

13

69.     On July 22, 2009, a Memorandum of Understanding for the Processing of Natural Gas and in the Production of Products from Associated Gas (the "MOU") was entered into between the Petroleum Ministry and P&ID (Nigeria).  **See Ex. 23**.

70.     From my inquiries, it appears that the MOU was not authorized by any government department or official (other than the Minister of Petroleum).  The Petroleum Ministry had bifurcated duties during the time that GSPA was being considered. Dr. Lukman was referred to as the "substantive Minister of Petroleum" and Odein Ajumogobia ("Mr. Ajumogobia") was referred to as the Minister for State.  The responsibilities were divided such that Dr. Lukman, as the substantive Minister, was in charge of petroleum, while the Minister for State, Mr. Ajumogobia, was in charge of gas.  The GSPA was a contract for a gas stripping plant, so it should have been the responsibility of Mr. Ajumogobia.  However, despite being in charge of petroleum and not gas, Dr. Lukman presided over the Petroleum Ministry's review of the GSPA and Dr. Lukman executed the GSPA on behalf of the Petroleum Ministry.  Mr. Ajumogobia has since disclaimed knowledge of the GSPA, because he was never involved with it in any way and did not execute it even though he was in charge of gas at the time on behalf of the Petroleum Ministry.

71.     Around this time in 2009 and 2010, Nigeria was experiencing a constitutional crisis. The then-President, Umaru Musa Yar'Adua, had been absent from office due to ill-health, and, in November 2009, had been evacuated to Saudi Arabia for treatment for an acute heart condition, known as pericarditis. He later returned to Nigeria to recover, but he eventually succumbed to his condition and died in May 2010. Because the President had left the country in emergency circumstances, he did not hand over power to his Vice President, as was required by the Nigerian Constitution. From November 2009, until February 2010, when Vice President

14

Goodluck Jonathan was appointed by the Nigerian senate to assume the role of president, there was a temporary "power vacuum" in Nigeria. **See Ex. 24**.

72.     It appears that Dr. Lukman took advantage of this by taking charge of the GSPA and forcing it through during the crisis period, despite the fact that he was the Minister in charge of petroleum, not gas.

73.     Dr. Lukman served as the substantive Minister[2] until March 17, 2010, when the acting President at the time, Goodluck Jonathan, dissolved his cabinet. **See Ex. 25**. Dr. Lukman died on July 21, 2014. **See Ex. 26**.

74.     To the best of my knowledge, at the time of entering into the MOU and the GSPA, neither the Petroleum Ministry nor any other government department conducted any due diligence on Michael Quinn, Brendan Cahill or P&ID prior to executing the documents.

75.     At a meeting concerning the GSPA held on August 10, 2010, Mr. Tijani, the Technical Assistant to the Minister of Petroleum and a member of the Technical Committee that awarded the GSPA to P&ID, told stakeholders that P&ID had been selected for the project "based on their presentation to the Minister" **See Ex. 27**, at ¶ 1.2 of the minute.

76.     Mr. Tijani further advocated for the "importance of the project" at a meeting on August 30, 2010 and told the stakeholders the project would be "at no cost to the Government." **See Ex. 28**, at ¶ 2 of the minute.

77.     In a recent interview with the EFCC on November 12, 2019, Mr. Tijani confirmed that no due diligence was carried out by his committee on P&ID's financial means, and that P&ID "did not show evidence of having executed any gas processing project in the past...." **See Ex. 29(a)**, at Page 6.

---

[2] In Nigeria, a "substantive" minister may be appointed alongside a junior minister to run the affairs of a Ministry.

78.    Instead, P&ID simply said that they would "bring[] some engineers" to the project who had prior experience. **See Ex. 29(a)**, at Page 6.

79.    Mr. Tijani also confirmed in his interview that, as far as he was aware, only two government committees were involved in reviewing P&ID's capabilities: the Technical Committee, of which Mr. Tijani was the chairperson, and the Legal Committee, which was headed by Grace Taiga. **See Ex. 29(a)**, at Page 7.

80.    It has been confirmed by the recent witness statement of Gbolahan Okesanya ("Mr. Okesanya"), provided to the EFCC on September 10, 2019, that the GSPA and P&ID were not referred to the National Petroleum Investment Management Services ("NAPIMS") for scrutiny in accordance with normal practice. **See Ex. 30(a)**, at Page 2.

81.    Mr. Okesanya was a member of the Accelerated Gas Development Committee of NAPIMS, a corporate body that manages the Nigeria's interests in the oil and gas industry. **See Ex. 30(a)**, at Page 1. Mr. Okesanya states that if the GSPA had been referred to NAPIMS, it would have conducted due diligence on P&ID's financial capabilities and the availability of a supply of wet gas for the project. **See Ex. 30(a)**, at Page 5. However, NAPIMS was not notified of the project until after the GSPA was executed. **See Ex. Ex. 30(a)**, at Page 2.

82.    On January 11, 2010, the GSPA was executed on behalf of the Petroleum Ministry by Dr. Lukman in the presence of Grace Taiga. Mr. Quinn executed the GSPA on behalf of P&ID, in the presence of Mr. Kuchazi. **See Ex. 1**.

83.    The alleged objective of the GSPA as set out at paragraph 2 of the GSPA itself was "to provide for the construction of Gas Processing Facilities by P&ID encompassing the provision of [natural gas or Wet Gas] by the Government and the processing of the said Wet Gas by P&ID utilizing two or more process streams with a total capacity of up to 400 MMSCuFD

together with all utilities, support and maintenance facilities at the Site and the provision of Lean Gas by P&ID to the Government as set forth in this Agreement and its Appendices and to operate and maintain the facilities in an efficient manner." **Ex. 1**, at ¶ 2.

84.     The Petroleum Ministry was obligated to supply gas (through certain petroleum companies) to P&ID (**see Ex. 1**, at ¶6(a)), ensure that the necessary infrastructure and requisite arrangements with third parties were in place to ensure the supply and delivery of the Wet Gas (**see Ex. 1**, at ¶6(b)) and assist P&ID where necessary to obtain permits, licenses and approvals from the government or others (paragraph 6(c)). **See Ex. 1**, at ¶ 6.

85.     For its, part, P&ID was obligated to construct and operate the facilities necessary to process the Wet Gas by removing the natural gas liquids ("NGLs") contained within it and to return to the Petroleum Ministry lean gas suitable for use in power generation or other purposes at no cost to the Petroleum Ministry. **See Ex. 1**, at ¶ 7.

86.     The GSPA was to remain in force for a period of 20 years. **See Ex. 1**, at ¶ 5.

87.     The recitals to the GSPA state that: "P&ID possesses the requisite finance, technology and competence for the fast track development of the project" (recital (h)); and "P&ID has undertaken all necessary studies, including the identification of suitable associated gas fields and is ready to commence a fast track development of the project in accordance with the terms of this agreement" (recital (i)). **See Ex. 1** at p. 3.

88.     Although the GSPA was signed by P&ID, a British Virgin Islands company, Nigerian law (Section 54(1) and (2) of the Companies and Allied Matters Act 2004) required a foreign company like P&ID to obtain incorporation in Nigeria to be able legally to carry on business in Nigeria and renders void any act done by such foreign company without local incorporation. **See Ex. 31.** Any Minister or other high-ranking Nigerian government official

doing business on behalf of the Nigerian Government would know this. It is therefore highly

suspicious that the Minister at the time, Dr. Lukman, chose to sign the contract with a British

Virgin Islands company.

89.     At the time the GSPA was entered into, certain authorization procedures were

required by law with a view to, among other things, combat corruption:

- Contracts with a value higher than N 300 million (about $ 2 million) were required to be authorized by the Bureau of Public Procurement pursuant to sections 15 and 16 of the Public Procurement Act 2007 (the "PPA"). **See Ex. 32**. Under the GSPA, one of the Government's obligations (**see Ex. 1**, ¶6(b)) was to "ensure that all pipelines and associated infrastructure are installed." Discharging that obligation alone would have cost the then Government more than N 300 million, and thus the GSPA would have required special authorization prior to its execution. No such prior authorization was obtained. **See Ex. 33**, at ¶ 3.

- Under Section 16 of the PPA, the Petroleum Ministry was required to ensure that contracts were offered as part of an open, competitive tender process and that they were based only on procurement plans supported by prior budgetary appropriations. **See Ex. 32**, at §16(I)(b) – (d). None of these requirements were met with the GSPA.

- The nature of the GSPA, which involved the exploitation of gas rights and the provision of infrastructure, required the prior approval of the Federal Executive Council, comprising the President and senior Ministers, as well as the Infrastructure Concession Regulatory Commission under sections 2(1) and (2) of the Infrastructure Concession Regulatory Commission (Establishment) Act 2005 ("ICRC"). **See Ex. 34**, at §2(1)-(2). No such approval was obtained for the GSPA.

- Section 4(1) of the ICRC required government departments to advertise any tender caught by the legislation in at least three national newspapers, inviting open, competitive bids for the project. **See Ex. 34**, at §4(1). However, no such advertisements were placed, and no competitive bids were received for the GSPA.

- Furthermore, the nature and sheer size of the contract envisaged by the GSPA, which would have involved infrastructural development, gas supply and construction of pipelines required the approval of the Federal Executive Council before it could have been validly signed by Dr. Lukman. The Federal Executive Council was not notified of the contract. **See Ex. 35**.

- The GSPA should also have been registered with the National Office for Technology Acquisition and Promotion in accordance with sections 4(d) and 5 of the National Office for Technology Acquisition and Promotion Act 1994, **see Ex. 36**, at §§4(d) and 5(1), because it was a contract in connection with the supply of engineering services and/or machinery and plants. P&ID failed to register the GSPA in accordance with act to the National Office for Technology Acquisition and Promotion. **See Ex. 37**.

90.    Under Nigerian law, the consequence of these requirements not being met is that the GSPA is null and void. For example, Section 16(I)(4) of the PPA expressly states that "any procurement purported to be awarded without a 'Certificate of 'No Objection' to Contract Award,' duly issued by the Bureau [of Public Procurement] shall be null and void." **See Ex. 32**, at §16(I)(4). As discussed above, the Bureau of Public Procurement has confirmed that it never issued the requisite "Certificate of 'No Objection" in relation to the GSPA. **See Ex. 33**.

91.    Prior to the signing of the GSPA, it was the duty of the Legal Adviser, Ms. Taiga, to ensure there was compliance with all extant laws and policy requirements, including obtaining the necessary government approvals and complying with the applicable transparency requirements. She must have been aware of her obligations, but it is clear she did not carry them out.

92.    For example, on December 18, 2009, Ms. Taiga sent a note to Dr Lukman (designated "HMSPR", Honorable Minister of State for Petroleum Resources) urging him to sign the draft GSPA. **See Ex. 114**, at ¶8. At this late stage, in the signature version of the GSPA, P&ID, a BVI entity, had been substituted for P&ID (Nigeria) (which had been the signatory to the initial MOU, and the proposed party to the previous draft of the GSPA). As detailed above, the replacement of a Nigerian entity with a non-Nigerian entity raised serious possible consequences for the Petroleum Ministry in contracting with a non-Nigerian entity, although this was not mentioned in the note.

93.     The only reasonable explanation for Ms. Taiga's conduct is that she wished to conceal the GSPA from other government officials and departments.  It appears from inquiries made by my team that knowledge and negotiation of the GSPA was initially limited to the staff of the Minister of Petroleum.

94.     It has also been discovered that Ms. Taiga wrote to members of staff at the Petroleum Ministry and the Nigerian National Petroleum Corporation (the "NNPC") misrepresenting that the GSPA presented no risk to Nigeria (**see Ex. 38**), and that Nigeria would be awarded fifty percent (50%) of the profits from the project. **See Ex. 39**.

95.     Ms. Taiga also ignored warnings from employees of the NNPC that the GSPA was an "open-ended arrangement with grave consequences to the owner/employer," and contained no grounds at all for termination. **See Ex. 40**.

96.     It is highly suspicious that Dr. Lukman and Ms. Taiga deliberately concealed such a large contract as the GSPA from the normal channels of Government scrutiny, as required by law.

**IV.     The Arbitration and the Arbitral Awards**

97.     No work was ever undertaken in furtherance of the GSPA.  P&ID never secured the land required for the project.  Moreover, it appears P&ID never made the investment in human resources, assets, or capital to undertake the construction and operation of a gas stripping plant.

98.     Instead, it appears that the intention from the outset was for P&ID to transform the GSPA into a claim against Nigeria, which it would then attempt to enforce through arbitration.

99.     On May 10, 2012, P&ID sent a letter to the Petroleum Ministry alleging a breach of the GSPA. **See Ex. 41**. Despite due inquiry, my colleagues have not identified any evidence that any other government department was made aware of this letter at the time.

100.    On August 22, 2012, P&ID initiated an arbitration (the "Arbitration") by issuing a notice of arbitration to the Petroleum Ministry expressing its intent to refer its dispute against Nigeria to arbitration in London under the Nigerian Arbitration and Conciliation Act of 2004 (**see Ex. 42**), and filed its Statement of Claim on June 28, 2013 (**see Ex. 43**).

101.    Three arbitrators (the "Tribunal") presided over the Arbitration, and issued three awards:  (1) a partial final award confirming the Tribunal's jurisdiction on July 3, 2014 (the "Jurisdictional Award"); (2) a partial final award concerning liability on July 17, 2015 (the "Liability Award"); and (3) a final award in favour of P&ID and against Nigeria in the amount of $6.6 billion, plus interest, on January 31, 2017 (the "Final Award," and together with the Jurisdictional Award and the Liability Award, the "Award"). The Jurisdictional Award, Liability Award, and Final Award are **Ex. 44,  Ex. 45, and  Ex. 6**, respectively.

102.    Following the commencement of the Arbitration on August 22, 2012, the former Attorney General Mr. Adoke assumed initial control of the Arbitration, including the selection of Nigeria's arbitrator (Chief Bayo Ojo), which was done through a letter sent by the Petroleum Ministry's legal adviser, Ibrahim H Dikko, on November 30, 2012. **See Ex. 46**.  Although the notice of selection of Chief Bayo Ojo was sent by the Petroleum Ministry, subsequent investigations have revealed that Mr. Adoke provided this instruction. **See Ex. 107, Ex. 107(a)**, at Page 4.

103.    In addition to directing the Petroleum Ministry to select Chief Bayo Ojo as the ministry's arbitrator, Mr. Adoke appointed Nigeria's solicitors and advocate in the Arbitration,

21

namely Twenty Marina Solicitors and Mr. Olasupo Shasore SAN ("Mr. Shasore"). Twenty Marina Solicitors represented the Petroleum Ministry at the jurisdiction and liability phases of the Arbitration, but was replaced by the Ministry of Justice with Chief Bolaji Ayorinde SAN, at the damages phase of the Arbitration.

104.   A legal adviser to the Ministry of Petroleum Resources at the time of the arbitration, Ibrahim Dikko, recently gave a statement to the EFCC, which statement is attached as **Ex. 107**, and transcribed by my legal team at **Ex. 107(a)**. In that statement, Mr. Dikko admits to having received a payment of $2,000 from Mr. Quinn under the pretext of paying for a visit to a professional conference in Ireland. **See Ex.107(a)**, at Page 8.

105.   Mr. Shasore's appointment as the Petroleum Ministry's legal counsel is highly suspicious, both for his failure to provide a meaningful defense in the phases of the Arbitration that he was charged to handle – the jurisdiction and liability phases – as well as the circumstances of his appointment.

106.   At the time the Arbitration was commenced (August 2012), Mr. Shasore was a member of one of Nigeria's oldest law firms, Ajumogobia & Okeke. According to a September 7, 2019 statement provided by Odein Ajumogobia ("Mr. Ajumogobia"), the founding partner of Ajumogobia & Okeke, in November 2012, a few months after the commencement of the Arbitration, Mr. Adoke had approached Mr. Ajumogobia to let Mr. Ajumogobia know that he had sent instructions regarding the P&ID case to Mr. Shasore. **See Ex. 20 and transcribed at Ex. 20(a)**, at Page 2.

107.   In October 2016, Mr. Shasore handed in his notice of resignation and left Ajumogobia & Okoke. As part of his exit, the firm audited all of the matters Mr. Shasore worked on during his tenure. The audit revealed that Mr. Shasore had worked on the P&ID

Arbitration without the involvement of anyone at Ajumogobia & Okeke (except for one of his close associates), the firm received no fees as a result of the work and all of the work had purportedly been performed under the name of Twenty Marina Solicitors, a firm used by Ajumogobia & Okeke to provide secretarial services to its clients. **See Ex. 20(a)**, at Page 3– Page 4.

108.    Based on our investigations, we now understand that Mr. Adoke, who has been implicated in a large-scale corruption in Nigeria, hand-picked the Petroleum Ministry's defense counsel, Mr. Shasore, which selection was done against the advice of the Legal Director of the Petroleum Ministry, Mr. Dikko.  Mr. Shasore then handed the Petroleum Ministry's defense to Twenty Marina Solicitors, a firm with no known knowledge or experience or track record of being capable of handling a matter as large as the Arbitration, and that Mr. Shasore failed to advise his employer, Ajumogboia & Okeke, of his activities.

109.    In the context of the known fraudulent activity surrounding the GSPA and the Arbitration, and in particular P&ID (Nigeria)'s attempts to buy influence within the Petroleum Ministry's legal team, Nigeria is treating the activities of Mr. Adoke and Mr. Shasore as highly suspicious.

110.    Evidence uncovered to date reveal evidence of improper payments made by Mr. Shasore – who was purportedly Petroleum Ministry's defense counsel – to Nigerian officials integrally involved in the Arbitration.  In his December 24, 2019, statement to the EFCC (**See Ex. 102**, which statement has been transcribed by my legal team at **Ex. 102(a)**), Mr. Shasore, admitted that he made payments of around $100,000 each to the Petroleum Ministry's Legal Director, Mrs. Adelore, and the NNPC's Legal Director, Mr. Oguine (who was the Petroleum Ministry's sole witness at the Arbitration), out of his fees for the Arbitration in 2014-15.

According to Mr. Shasore, Mr. Oguine initially attempted to return the payment, but Mr. Shasore insisted that the payments were "gifts to them personally" and was not in return for any favor or official function. Nigeria is treating these payments as highly suspicious. There is no obvious reason why Mr. Shasore – as the Petroleum Ministry's legal counsel - should have given such substantial gifts to these individuals. The inference is that they were paid for their silence in relation to the conduct of the Arbitration.   It is particularly concerning that the EFCC investigation in 2016 was reliant in large part on documents and information provided by Mrs. Adelore, the recipient of one of the large payments. **See Ex. 102(a)**, at Page 7– Page 8.

111.    As further discussed above, after this initial stage the Arbitration was handled by then Minister of Petroleum, Ms. Alison-Madueke. Ms. Alison-Madueke was removed as Minister of Petroleum in May 2015 (after the conclusion of the jurisdiction and liability phases of the Arbitration) and has since been charged with engaging in fraudulent dealings during her tenure as minister, including various money laundering offences and awarding multibillion Naira contracts without recourse to due process. **See Ex. 47**.   Further, the EFCC has uncovered evidence that Ms. Alison-Madueke wielded her influence as Minister for Petroleum to award lucrative contracts in exchange for unlawful commissions and gifts. **See Ex. 49** and **Ex. 69**.

112.    On August 28, 2017, a Nigerian Federal Court seized 7.6 billion naira ($21 million) from bank accounts linked to Ms. Alison-Madueke. **See Ex. 48.**

113.    Reviewing the manner in which the Arbitration was conducted, it is clear that Nigeria's interests were not well protected.

114.    As recorded at paragraph 28 of the Tribunal's Jurisdictional Award, Nigeria's counsel was allegedly unable to obtain instructions in relation to the conduct of the jurisdiction challenge before the Tribunal. **See Ex. 44**, at ¶28.

115.   As further set forth in the Liability Award, Nigeria failed to produce documents and evidence within the time-limits ordered by the Arbitrators. **See Ex. 45**, at ¶21.

116.   Inexplicably, Nigeria did not make any application to cross-examine P&ID's witnesses at the case management conference prior to the liability hearing.  As the Arbitrators held in the Liability Award, Nigeria was therefore barred from conducting any cross-examination at the main hearing. **See Ex. 45**, at ¶28.  This meant that the Arbitrators would credit the self-serving witness statement of Mr. Quinn, who died days after issuing his statement. Mr. Quinn's "testimony" about P&ID's financial wherewithal, experience, and infrastructure to perform was highly suspect, but left effectively unchallenged by the malfeasance of Nigeria's counsel and the Petroleum Ministry.  This is an astonishing lapse given the stakes, and in my view can only be the result of intentional malfeasance by Nigeria's counsel and the Petroleum Ministry officials to whom he reported, as opposed to mere negligence.

117.   As set forth in the Liability Award, Nigeria's only witness, Mr. Ikechulkwu Oguine, who I understand did not possess any first-hand knowledge of the GSPA, gave "no relevant evidence" to the Tribunal, merely relying on references to documents in the record and other submissions, and his testimony was disregarded by the Arbitrators. **See Ex. 45**, at ¶35.

118.   Additional facts of circumstances of the Arbitration demonstrate that it was unusual and highly suspect.

119.   The Petroleum Ministry did not provide any updates about the Arbitration to the Ministry of Justice prior to the delivery of the Jurisdictional Award and the Liability Award.  It is highly unusual for an arbitration of such importance to be concealed for so long from the Ministry of Justice.

120.   Ms. Alison-Madueke, whose extradition from the United Kingdom is currently being sought in respect of large-scale fraud and corruption during her time in the post. Nigeria has uncovered preliminary evidence that Ms. Alison-Madueke ordered certain files to be moved out of their normal place of custody to archives. These files may have included files relating to the GSPA and the dispute with P&ID. Such orders would not normally be provided by a minister and it is to be inferred that Ms. Alison-Madueke may have been deliberately tampering with records. Investigations into her involvement are continuing.

121.   I understand that a high-level meeting was held on August 19, 2015, around one month after the Tribunal published its Liability Award.  The meeting was attended by the Vice President of Nigeria, His Excellency Professor Yemi Osinbajo SAN, the Deputy Chief of Staff Mr. Ade Ipaye, the Solicitor General Mr. Abdullahi Yola, and the Director of Legal Services of the Ministry of Justice.  Without waiving privilege, at that meeting Nigeria resolved that P&ID should be approached for settlement discussions, and that, in parallel, quantum experts be approached as well.

122.   On December 23, 2015, Nigeria unsuccessfully applied to challenge the Liability Award before the English High Court under Section 68 of the Arbitration Act of 1996 on the grounds of inconsistent reasoning and failure to address with certain arguments.  Without waiving privilege, I understand that the Petroleum Ministry's then counsel, Mr. Shasore, advised the Petroleum Ministry to take this step.  The Petroleum Ministry remained responsible for the proceedings at this time.

123.   Around this time, on November 11, 2015, Ms. Alison-Madueke had been succeeded by Muhammadu Buhari as Petroleum Minister. Mr. Buhari had recently been elected as the President of Nigeria, succeeding Goodluck Jonathan. Mr. Buhari chose to take control of

the Petroleum Ministry directly, as he was entitled to do as President, rather than appointing a Minister to do so, having vowed to recover the millions of dollars' worth of funds he alleged were stolen during previous administrations. **See Ex. 49**.

124.    The proceedings were eventually referred from the Petroleum Ministry to the Ministry of Justice in early 2016. Without waiving privilege, upon this transfer of responsibility from the Petroleum Ministry to the Ministry of Justice, Nigeria changed its legal team.  I requested an audience with Mr. Shasore to discuss his handling of the Arbitration, which request was refused. Mr. Shasore preferred to continue dealing with the Petroleum Ministry.  As a result of his refusal to cooperate with the Ministry of Justice, he and Twenty Marina Solicitors were terminated. Chief Bolaji Ayorinde SAN was instructed to represent Nigeria in the damages phase of the Arbitration.

125.    On August 15, 2016, the Ministry of Justice instructed Upstream Commercial Advisory Limited as its quantum expert.

126.    Throughout all three stages of the Arbitration, P&ID was represented by Mr. Seamus Andrew. I find it odd that he was P&ID's legal representative. Mr. Andrew is a director of Lismore Capital, **see Ex. 50**, which public lobbying filings in the United States identify as a 75% owner of P&ID. **See Ex. 7**.  It is unclear to me how Mr. Andrew reconciled his potentially competing duties to Lismore Capital, as director, and to the Tribunal, as a solicitor. Mr. Andrew's involvement shows that, until the final damages stage when the Ministry of Justice became involved, the Arbitration was being conducted by a small circle of individuals associated with the Petroleum Ministry and P&ID, with little outside involvement or oversight.

127.    Despite Nigeria's late steps to change its representation, the Arbitrators found in favor of P&ID at the damages stage.  As part of its conclusion the Arbitrators found, based on

the unchallenged written witness statement of Mr. Quinn, that P&ID was ready and able to perform the contract, despite being a shell company in the British Virgin Islands. **See Ex. 6**, at ¶¶48-56.

128.   Mr. Quinn's statements relating to P&ID's readiness to perform the GSPA are demonstrably false.

129.   Specifically, Mr. Quinn's written statement to the Tribunal was that P&ID had incurred costs of $40 million preparing to perform the GSPA, presumably to dispel the impression that the contract was a sham. **See Ex. 6**, at ¶50.

130.   However, on September 20, 2019, the EFCC discovered that these funds were not genuinely expended on the project. Rather, on June 27, 2006, Tita-Kuru Petrochemicals Limited ("Tita-Kuru"), a Nigerian company, signed a Service Agreement with P&ID for the undertaking of Process Package, Balance of Plant Engineering Design and Business Development Services, in respect of something known as Project Alpha. The agreement was signed by Lieutenant General TY Danjuma (Rtd), a well-known Nigerian businessman, on behalf of Tita-Kuru. Mr. Hitchcock signed for P&ID. **See Ex. 51**, at p. 10.

131.   On September 6, 2006, Lt. General Danjuma (Rtd) and P&ID signed a further agreement, entitled the Engineering Services Agreement, which expanded the scope of the engineering and design services to be provided. **See Ex. 52**, at p. 9. The agreed budget for these services was up to $39,182,000. **See Ex. 52**, at §6.1.

132.   These contracts appear to form the basis of the alleged "preparatory engineering work" on which Mr. Quinn gave evidence to the Tribunal. **See Ex. 5**, at ¶42.

133.   However, the contracts were for P&ID to provide the design and engineering services to Tita-Kuru, not vice-versa. Tita-Kuru was therefore the paying party under the contracts.

134.   According to Tita-Kuru, the intellectual property rights in P&ID's work belonged to them and accordingly "the application for the [GSPA] to the [Petroleum Ministry] by our consultants (P&ID) was to have been in the name of our Company (Tita-Kuru) and not P&ID." **See Ex. 53**, at §3.1.6.

135.   Thus, as Tita-Kuru explains, "It was therefore a rude shock to our Company when Mr. Quinn, later turned around to inform us that not only was the application to the [Petroleum Ministry] made in the name of his Company but that P&ID had actually executed a formal Agreement [*i.e.* the GSPA] (behind our back) with the [Petroleum Ministry] for the Gas Supply and Processing, with the site to be located at Calabar." **See Ex. 53**, at §3.1.7.

136.   In any event, the scope of services purportedly to be provided under the agreement (as amended) was restricted to the design of a "250,000 tonne/annum Natural Gas to Propylene (Propane) Production Plant," which does not correspond with the facilities which were due to be provided under the GSPA. **See Ex. 5**, at ¶42; **Ex.52**, at p. 12 (Ex. A thereto).

137.   The two companies allegedly fell out when P&ID appropriated the engineering and design work for which it had been paid and used it to bid for the GSPA. The parties subsequently reached a settlement. **See Ex. 53**, at §3.1.8.

138.   On October 22, 2019, the EFCC uncovered evidence confirming that between August 14, 2006 and March 21, 2007, substantial sums were paid to P&ID through their British Virgin Islands offshore account in tranches by Lt. Gen. TY Danjuma/Tita-Kuru. **See Ex. 54**.

139.   In addition, Karel Vlok, identified as a "Process Director" on invoices submitted by P&ID to Tita-Kuru Petrochemicals Limited, who allegedly performed over 1,000 hours of work for P&ID (**see Ex. 56),** was also a director of a company called Kran Developments ("Kran") at the time Project Alpha was said to have been carried out (s**ee Ex. 57**), indicating a possible conflict of interest or collusion between P&ID and Kran.   Kran received substantial payments from Project Alpha amounting to in excess of $12 million, as is confirmed in an email sent by Mr. Vlok to Messrs. Hitchcock and Zorto, dated August 24, 2007.   **See Ex. 58**.

140.   Mr. Quinn's evidence that he had incurred costs of $40 million in preparing to perform the GSPA was therefore fraudulent. In fact, it appears that P&ID did not engage anybody to carry out preparatory work and did not incur any costs.

141.   On its website, www.pandidfacts.com, P&ID states that the $40 million was paid for "preparatory work"; that P&ID was "reimbursed" for this expenditure; and that it did not claim the $40 million in the arbitration.   **See Ex.  59**.   This misses the point, which is that, contrary to Mr. Quinn's evidence to the Tribunal, P&ID had not, itself, incurred $40 million costs in preparing to perform the GSPA.

142.   The Nigerian police also discovered as part of their investigations in September 2019 that, contrary to his assertions at paragraphs 13 - 14 of his first witness statement in the arbitration proceedings dated February 10, 2014 (**see Ex. 5**), Mr. Quinn had no prior experience of oil and gas projects with Shell, as confirmed by Shell's letter to the Assistant Inspector General of Police dated September 9, 2019.   **See Ex. 60**.

143.   Further, Mr. Quinn's statement that he previously worked as an adviser to the Power Holding Company of Nigeria (**see Ex. 5**, at Paragraph 16), has also been doubted, as there

are no records of his alleged work for the Company. **See Ex. 61, Ex. 62**. These aspects of his evidence to the Tribunal were therefore also fraudulent.

144.     Based on the chronology of the Arbitration, it appears that the Arbitration proceedings were kept "in-house" at the Petroleum Ministry until the final damages phase because officials and employees of the Petroleum Ministry were aware that the GSPA and the Arbitration were a sham, and that some of those officials and employees stood to make a financial gain out of the arrangement.

145.     The Final Award awarded to P&ID was the extraordinarily high sum of $6.6 billion.  Together with interest, the total amount alleged to be outstanding is over $9.66 billion. To put this sum into context, the outstanding amount is almost five times the Nigeria's 2019 budget for education (which amounts to approximately $2.07 billion); it is more than eight times Nigeria's national health budget for 2019 of around $1.2 billion; it is more than five times higher than the Nigeria's budget for countering terrorism, including the activities of Boko Haram, which is approximately $1.9 billion; it is double the combined budgets of three of the most important spending ministries in the Nigerian government; and it is well over one quarter of Nigeria's gross foreign reserves. **See Ex. 63**.

146.     There can be no serious doubt that enforcement of the Final Award against Nigeria would devastate the Nigerian economy and, ultimately, the Nigerian people.

## V.     President Muhammadu Buhari's Efforts to Fight Nigeria's Endemic Corruption

147.     Nigeria has a long history of endemic corruption under previous regimes, including under various leaders of Military governments in the 1980s and 1990s and under President Olusegun Obasanjo from May 1999 to May 2007, during which several bribery scandals arose.

148.    President Umaru Yar'Adua succeeded President Obasanjo.  However, he passed away in May 2010 following a long illness. He was succeeded by the then Vice President, Goodluck Jonathan.  In March 2011, Mr. Goodluck Jonathan won the presidential elections to continue in office.

149.    The Petroleum Minister who signed the GSPA, Dr. Lukman, remained in office until March 17, 2010.  Based upon our investigation to date, I believe Dr. Lukman must have been involved in the fraudulent GSPA.  For example, recent investigations have discovered that on January 16, 2009, just one month after his re-appointment as Minister for Petroleum Resources, Dr. Lukman opened a US Dollar account at Guaranty Trust Bank with an initial cash deposit of $10,000.  **See Ex. 18**. Nigeria is treating this transaction as suspicious, given the large amount of cash deposited and the known fraudulent activity surrounding the GSPA.

150.    As to Dr. Lukman's successor, Ms. Alison-Madueke, we are still investigating whether she participated in scheme relating to the GSPA and the Arbitration.  Ms. Alison-Madueke executed at least two memoranda of understanding with P&ID.

151.    Nigeria is conducting investigations into allegations that Ms. Alison-Madueke stood to gain from a settlement with P&ID.  I have seen a without prejudice letter addressed for her attention dated May 6, 2015 which evidences that she was at least aware of the ongoing Arbitration and communications relating to a possible settlement.  This was during the time that the Arbitration was being conducted in the unusual manner outside the purview of the Ministry of Justice, and in a way that made it more likely that an award would be made in favor of P&ID.

152.    In March 2015, the current President of Nigeria, Muhammadu Buhari, won the presidential election, becoming the first opposition candidate to do so in Nigeria's history.  In February 2019, he was reelected to another term in office.

153.    On November 11, 2015, President Buhari appointed himself as the Minister of Petroleum.  While the role of Minister of Petroleum is not automatically subsumed within the office of the President, the President is vested with all the executive powers of the Federation under section 5(1)(a) of Nigeria's 1999 Constitution (as amended), and he may choose to exercise these executive powers either directly, through the Vice-President or through Ministers of the Government of the Federation or other officers of the public service of the Federation. Furthermore, under section 147(1) of the 1999 Constitution (as amended), the President also has the prerogative of establishing offices of Ministers of the Government of the Federation as he may determine.  **See Ex. 64**, at §147(1).

154.    In the same vein, the President by virtue of section 148(1) of the 1999 Constitution (as amended), may in his discretion, assign to the Vice-President, or any Minister of the Government of the Federation, responsibility for any business of the Government of the Federation, including the administration of any department of government. Therefore, the President is constitutionally empowered to administer the Petroleum Ministry directly or assign the responsibility to a Minister of his choice.  **See Ex. 64**, at §148(1).

155.    In contrast to the previous regime under President Goodluck Jonathan, President Buhari has made fighting corruption a top priority in both his first and second terms and has not shied away from bringing many in the previous regime to justice.

156.    For example, under President Buhari, the EFCC recorded a total of 603 convictions between 2015 and May 29, 2018, which is roughly double the rate of convictions secured by the EFCC under President Goodluck Jonathan.  **See Ex. 65**.  The EFCC is a statutory body set up by the EFCC Establishment Act of 2004 and is vested with power to conduct

investigations into whether any person, corporate body or organization has committed an offence under the Act or other laws of Nigeria relating to economic and financial matters.

157.    The EFCC successfully convicted Senior Advocate of Nigeria Joseph Nwobike in May 2018 for perverting the course of justice.  Mr. Nwobike was convicted of offering the sum of N750,000 (approx. $2,000) and N300,000 (approx. $820) to various Federal High Court judges (Mohammed Yunusa and Hyeladzira Nganjiwa).  Although Mr. Nwobike claimed that one of these sums was intended to help the judge's sick mother, he was convicted nonetheless. Corruption charges were also brought against Justice Yunusa and Justice Nganjiwa for receiving the bribes.  **See Ex. 66**.

158.    The EFCC also successfully convicted Jolly Nyame, the former Governor of Taraba State, on charges of receiving gratification, obtaining public funds without due consideration, and criminal breach of trust, involving the diversion of N 1.64 billion (approximately. $4.5 million) all of which occurred during his tenure from 1999 to 2007.  **See Ex. 67**.

159.    The OPL 245 case involved large-scale corruption and fraud at the highest levels of Nigerian government, whereby Royal Dutch Shell used bribes to secure lucrative oil drilling rights in the in the southern Niger Delta.  The EFCC brought charges against the former Nigerian officials and the major oil companies involved in the OPL 245 scheme.  This includes Attorney General, Mr. Adoke, who EFCC charged with corruption and money laundering for receiving funds as payment for the negotiations he allegedly brokered between Shell, Italian oil company Eni, and Malabu Oil & Gas for OPL 245.  The EFCC also charged former Minister of Petroleum Dan Etete with corruption for his role in fraudulently awarding the license to his own company in the first place as well as his involvement with Malabu.  Both Shell and Eni have been charged

by the EFCC over the payments they made which they allegedly knew would flow to Malabu. In 2017, Italian prosecutors in Milan also brought charges against executives from Shell and Eni on international corruption charges, and their prosecution is ongoing. **See Ex. 68**.

160.   In 2015, President Buhari established the Presidential Advisory Committee Against Corruption, and its mandate is to advise him on tackling corruption and potential reforms to the legal system. **See Ex. 70**.

161.   Nigeria's Ministry of Finance issued the "Whistle Blowers' Policy" in December 2016 which is "designed to encourage anyone with information about a violation of financial regulations, mismanagement of public funds and assets, financial malpractice, fraud, or theft to report them to relevant authorities." **See Ex. 71**.

162.   President Buhari has also published the "National Anti-Corruption Strategy (NACS) 2017-2021" in order to provide a coordinated policy to guide all sectors, and to develop and implement mechanisms to improve public governance at all levels. **See Ex. 72**.

163.   Policies under the NACS include, among other things: (i) signing the Open Government Partnership in 2016, a multi-lateral initiative that aims to secure concrete commitments from national and subnational governments to promote open government, empower citizens and fight corruption; (ii) strengthening anti-corruption with such policies as the Treasury Single Account which has (using bank verification numbers) removed thousands of non-existent persons from the government payroll; and (iii) committing to recovering stolen wealth. **See Ex. 72**, at p.6.

164.   In June 2018, pursuant to these policies, Nigeria secured the conviction of Joshua Dariye, the Governor of Plateau State (a Nigerian province), for criminal breach of trust and misappropriation of approximately N 1.6 billion (approximately $4.5 million). Mr. Dariye was

sentenced to fourteen years in prison, which was subsequently reduced to ten years on appeal. **See Ex. 73**.

165.   The EFCC's current and ongoing investigations into the circumstances surrounding the GSPA are part of the Buhari administration's commitment to fighting corruption in Nigeria.

166.   It is of obvious significance that this endemic corruption, which the present regime is taking great strides to eliminate, was rampant during the time the GSPA was negotiated and while P&ID prosecuted its claim in the Arbitration.

167.   It is my belief, based on the information our investigation has uncovered to date, that the GSPA was unfortunately yet another example of high-level Nigerian officials using sham commercial deals to fraudulently divert resources which were the property of the Nigerian state to themselves and their co-conspirators.

## VI.   **Nigeria's Investigation Concerning the GSPA and the Arbitration**

168.   As discussed above, at the direction of Vice-President Yemi Osinbajo, and the instructions of Chief of Staff to President, Abba Kyari, I directed the EFCC to commence an investigation into the circumstances surrounding the GSPA and Arbitration. **See Ex. 119**.

169.   Investigations and allegations of fraud and governmental corruption are extremely complex and time-consuming. The EFCC has, nonetheless, conducted its investigations as quickly as possible since June 2018. Given the complexity of the nature of this investigation, spanning multiple jurisdictions and analysis of more than forty entities and transactions relating to them, as well as interviewing more than thirty witnesses to date, the EFCC has conducted its investigation quickly and effectively.

170.    Following my letter to the EFCC, a large number of requests for information were made by the EFCC to other government agencies. In particular, requests for assistance were sent to: The Petroleum Ministry (August 3, 2018) (**see Ex. 75**); The Corporate Affairs Commission (August 3, 2018) (**see Ex. 76**); The Nigerian Content Monitoring and Development Board (August 3, 2018) (**see Ex. 77**); The Bureau of Public Procurement (August 3, 2018) (**see Ex. 78**); Ministry of Lands Cross Rivers State (January 11, 2019) (**see Ex. 79**); The Federal Inland Revenue Service (January 28, 2019); Nigerian Electricity Commission (August 19, 2019) (**see Ex. 80**); The National Office on Technology Acquisition and Promotion (August 23, 2019); The Special Control Unit against Money Laundering (August 26, 2019) (**see Ex. 81**); Infrastructure Concession Regulatory Commission (September 4, 2019) (**see Ex. 82**); Key Government agencies (**e.g. see Ex. 83**), oil companies including Addax Petroleum (September 9, 2019) (**see Ex. 84**); Shell and Exxon Mobile (August 28, 2019) (**see Ex. 60, Ex. 85**); and several local banks, including Guaranty Bank (August 23, 2019) (**see Ex. 86**) and Zenith Bank (September 20, 2019) (**see Ex. 87**).

171.    After making these requests for assistance, between June 2018 and July 2019, the EFCC undertook background intelligence and data analysis concerning the GSPA, including profiling associated companies and individuals, analyzing statements of account and interrogating the local director of P&ID (Nigeria).

172.    On August 20, 2019, the Solicitor General of the Federation referred the suspicions of fraud concerning the GSPA to the Nigeria Police Force. In particular, it requested the Police Force to look into "the underhand manners by which the negotiation, signing and formation of the contract was carried out by some vested interests in the past administration," and therefore "all the direct and indirect activities and roles played by private individuals,

corporate entities and Government officials (home or abroad and past or present) that led to [the signing of the GSPA and the subsequent arbitral award]." **See Ex. 88**. This request was made to broaden the investigation beyond the EFCC's remit, which is limited to financial and related matters.

173.   On August 26, 2019, bank statements of P&ID (Nigeria) were provided to the EFCC by Guaranty Bank Trust. The accounts cover the period from opening of the account on August 16, 2006 until April 20, 2018, which spans the full period during which P&ID asserts that it was preparing to execute the GSPA. **See Ex. 89** and **Ex. 90**. These bank statements showed large unexplained cash withdrawals and money transfers. The EFCC is continuing to investigate to whom this money was paid.

174.   Even on a preliminary analysis, it seems clear from the above totals that the cash flows into and out of P&ID (Nigeria)'s accounts are not consistent with a legitimate operating company involved in a multi-billion dollar gas-processing contract such as the GSPA (which is what Mr. Quinn claimed it was). **See Ex. 5**, at ¶17.

175.   This is demonstrated in the summary analyses at **Ex. 123**. By way of example:

   a. The table at **Ex. 123**, pp. 21-22, demonstrates a series of large, round-payment transactions on P&ID (Nigeria)'s US Dollar account with Guaranty Bank Trust between September 6, 2006 to March 14, 2011 (which is the period for which statements are available).

   b. The calculation at **Ex 123**, p. 53, demonstrates that 27% of the deposits into, and 55% of the withdrawals out of, P&ID (Nigeria)'s Naira account with Guaranty Bank Trust were in cash. The overall pattern of cash deposits and withdrawals, which are predominantly withdrawals by Mr. Hitchcock in lump sums of between NGN 500,000 (appx. $1,362) to NGN 1,500,000 (appx. $4,086), can be seen from the table at **Ex. 123**, pp. 54-55.

176.   These patterns of activity are inconsistent with a legitimately operating petrochemicals company involved in a multi-billion dollar gas processing contract.

177.   The cash withdrawals are not limited to P&ID but also include affiliated companies such as ICIL Limited, Goidel Resources Limited, Lurgi and over twenty other companies. The EFCC's investigations have revealed that P&ID (Nigeria) has at least twenty-eight associate companies registered in Nigeria, while P&ID has ten affiliated companies registered in Ireland, the British Virgin Islands, Cyprus and other parts of the world. **See Ex. 91**. Several of these companies have made payments to Nigerian government employees involved in the negotiation of the GSPA and oversight of the Arbitration.

178.   On August 28, 2019, the Federal Inland Revenue Services revealed to the EFCC that P&ID had not opened a tax file. **See Ex. 92**.

179.   On September 3, 2019, the Special Control Unit against Money Laundering confirmed that P&ID (Nigeria) has violated S.5(1)(a), S.9 & S. I 0 of the Money Laundering (Prohibition) Act, 2011 (as amended), by failing to declare their activities and reporting transactions to the EFCC. **See Ex. 93**.

180.   On September 4, 2019, the Ministry of Lands and Urban Development, Calabar, Cross Rivers State confirmed in a letter to the EFCC that P&ID (Nigeria) was never allocated any land. **See Ex. 94**. Pursuant to Sections 1(xiv) and 3(a) of the GSPA, the scope of work included that P&ID would construct Gas Processing Facilities on the site allocated to them by Cross River State Government. **See Ex. 1**, at Sections 1(xiv) and 3(a). However, while P&ID (Nigeria) was issued with a Letter of Offer of Land on February 16, 2010, P&ID never paid the prescribed fee within 120 days of the offer. The offer was therefore forfeited. The fact that

P&ID did not even hold any land on which to conduct its activities under the GSPA is a further indication that the arrangement was not genuine.

181.   On September 19, 2019, the High Court of Nigeria (Abuja Division) convicted P&ID and its local subsidiary, P&ID (Nigeria), of fraudulent misrepresentation relating to P&ID's ownership of a plot of land, trading without certain licenses, carrying on business through a foreign company, laundering proceeds of an unlawful act, concealing the unlawful origin of certain payments, under-paying of tax, and failure to register with the relevant money-laundering authority. **See Ex. 95**.   The Court imposed a sentence of winding up both companies' affairs and forfeiting their assets to the state. **See Ex. 96**.

182.   The EFCC has uncovered suspicious payments made to two government employees involved in the award of the GSPA to P&ID, namely Ms. Taiga and Mr. Tijani. Ms. Taiga and Mr. Tijani were members of the Legal Committee and the Technical Committee for the GSPA, respectively.  Indeed, Mr. Tijani recently confirmed to the EFCC that these were the only two committees which oversaw the award of the GSPA. **See Ex. 29(a)**, at Page 7.

183.   Nigeria's investigation of Ms. Taiga commenced in late 2018, along with over thirty companies and several other individuals.  The EFCC began taking witness evidence from Ms. Taiga in August 2019.  Ms. Taiga's bank statements were requested from Zenith Bank on September 20, 2019. **See Ex. 99**.

184.   Ms. Taiga became a person of interest because: (a) Ms. Taiga was named as a witness to the GSPA; and (b) it was clear, on investigation, that none of the basic authorization procedures had been met for the GSPA.  As the lead lawyer within the Petroleum Ministry, Ms. Taiga was in charge of ensuring those procedures were followed.

185.    Ms. Taiga's bank statements were provided to the EFCC on October 2, 2019. They demonstrate that she received payments made by two companies affiliated with P&ID, namely Eastwise and ICIL.

186.    On September 14, 2015, a payment of $1,000 was made by Eastwise through Ms. Taiga's Zenith Bank account. **See Ex. 13**, at p. 1.

187.    On December 18, 2017, a payment of $10,000 was made by ICIL through Ms. Taiga's Zenith Bank account. **See Ex. 13**, at p. 1.

188.    On June 27, 2018, a further payment of $10,000 was made by ICIL through Ms. Taiga's Zenith Bank account. **See Ex. 13**, at p. 1.

189.    On March 27, 2019, a payment of N 194,230 (approximately $530) was made by ICIL through Ms. Taiga's Zenith Bank account. **See Ex. 14**, at p. 15.

190.    On March 28, 2019, a further payment of N194,210 (approximately $530) was made by ICIL through her Zenith Bank account. **See Ex. 14**, at p. 16.

191.    There is no plausible explanation for these payments, other than that they were made in return for Ms. Taiga's assistance in procuring the GSPA.

192.    On September 19, 2019, Ms. Taiga was charged with a series of offences under Nigerian law, including receiving bribes contrary to the Corrupt Practices and other Related Offences Act 2000. **See Ex. 100**.

193.    On March 2, 2020, the London branch of Citibank disclosed certain SWIFT records describing payments made to Eastwise and ICIL Ireland, which reveal two additional payments of €500 made to Ms. Taiga on March 1, 2019 and March 25, 2019 by ICIL Ireland. **See Ex. 120**.

194.    A hearing on charges against Ms. Taiga began on November 6, 2019.

195. In her evidence provided under caution in the proceedings, Ms. Taiga confirmed that she provided no services to Eastwise or ICIL for these payments. Indeed, in her sworn statement, attached as **Ex. 11**, which my legal team has transcribed in **Ex. 11(a)**, Ms. Taiga stated that she "did not render any services to the depositors [i.e. Eastwise and ICIL] at any time." **See Ex. 11(a)**, at Page 2.

196. Instead, Ms. Taiga and Mr. Cahill produced a contrived letter dated September 16, 2015, in which Mr. Cahill states: "This is to confirm that the $1,000 which I forwarded to you at Zenith Bank is a contribution towards your medical expenses. I further confirm that both I and my deceased business partner [i.e. Michael Quinn] have been close personal friends of yours for many years." The letter is signed: "Brendan Cahill ... Eastwise Trading Limited." **See Ex. 12**.

197. Mr. Tijani's bank statements were also requested from Guaranty Trust Bank, Mr. Tijani was a member of the Technical Committee that awarded the GSPA to P&ID and is known to have been a close technical assistant of the Minister, Dr Lukman. The Technical Committee did not enquire into P&ID's financial backing when it awarded the GSPA, nor did it raise the issue that P&ID seemingly had no expertise in prior gas-stripping projects.

198. Mr. Tijani's bank statements were provided by Guaranty Bank on November 4, 2019. **See Ex. 98**. Mr. Tijani's bank statements demonstrate he received payments from P&ID affiliate Lurgi.

199. On April 3, 2014, a payment of N3,440,000 (approximately $20,000) was made to Mr. Tijani's account with Guaranty Trust Bank. **See Ex. 98**, at p. 1.

200. On April 22, 2015, a payment of N4,000,000 (approximately $20,000) were made to Mr. Tijani's account with Guaranty Trust Bank. **See Ex. 98**, at p. 2.

201.    In a written statement provided to the EFCC on January 12, 2020, (**see Ex. 9**), which my legal team has transcribed (**see Ex. 9(a)**), Mr. Tijani explained that, in or around early April 2009, following the submission by P&ID of its proposal to invest in gas development and a briefing by Dr. Lukman (the then Petroleum Minister) to the Technical Team (of which Mr. Tijani was the chairperson) (**see Ex. 9(a)**, at Page 3), the directors of P&ID visited Mr. Tijani's office on a "courtesy visit." **See Ex. 9(a)**, at Page 4.

202.    An hour after they left, Mr. Tijani received a call from Dr Lukman's office requesting that Mr. Tijani go to Dr Lukman's office. On arrival, Mr. Tijani met the two directors of P&ID, namely "Messrs. Michael Quinn and Neil Hitchcock." Dr. Lukman "directed" Mr. Tijani to "give them all the necessary support in their proposals for the accelerated gas development project." On Mr. Tijani's return to his office, he recalls that Messrs. Quinn and Hitchcock passed by his office to thank him and invite him to join them for dinner. Mr. Tijani therefore joined Messrs. Quinn and Hitchcock for dinner at Chopsticks Chinese Restaurant. He notes that during dinner they "held several discussions on International news, sports and so on but nothing [was] discussed about [P&ID's] proposals for the gas project." **See Ex. 9(a)**, at Page 4.

203.    Mr. Tijani further stated that after dinner Mr. Hitchcock escorted him to his car to say goodbye, opened the back door and dropped a black bag in the car, which he said was a "gift." Upon returning to his home, Mr. Tijani discovered $50,000 in the bag. When Mr. Tijani called Mr. Hitchcock to question the funds, he was told "it was just a gift for me and that they normally take care of their friends and that I received them warmly in my office and they wanted us to be friends." Mr. Tijani also recalls, "they also promised that they will further take care of me better at a later date." **See Ex. 9(a)**, at Page 5.

43

204. In his written statement, Mr. Tijani further confirmed that when the Technical Team under his chairmanship reviewed P&ID's proposal for the GSPA, they discovered that P&ID "did not have any past experience of gas development projects" and that there was "no strong evidence of financial capabilities," nor had they "secured the land location in Calabar Cross-Rivers State as stated in their proposals." **See Ex. 9(a)**, at Page 5 – Page 6.

205. Yet, Mr. Tijani admitted that he "deliberately overlooked all the shortcomings" because of the direction given to him by Dr. Lukman to provide P&ID with all the support they needed for the project. **See Ex. 9(a)**, at Page 6.

206. The EFCC also discovered a number of suspicious payments relating to a Nigerian company named Conserve Oil Nigeria Limited ("Conserve Oil"). In November 2019, searches of Mr. Tijani's residence led to the retrieval of bank statement documents relating to Conserve Oil. The timing of payments made to Conserve Oil, a company that, as explained below, Mr. Tijani has a direct relationship with, is highly suspicious in that the payments were made by P&ID affiliated entities to Conserve Oil at key moments during the arbitration.

207. Conserve Oil's statements revealed the following payments: (a) $54,672.79 from Lurgi on July 16, 2013 (the "July 2013 Payment"); (b) $50,000 from Lurgi on August 12, 2013 (the "August 2013 Payment"); (c) $30,000 from an offshore account in the name of SESFTF Progress Limited ("SESFTF") on October 17, 2013; and N 55,504,768.41 (approximately $336,843) from Lurgi on March 10, 2014. **See Ex. 101(a)**, at Page 4- Page 5.

208. SESFTF is believed to be an affiliated company of P&ID.[3] SESFTF has the same registered address as Eastwise (**see Ex. 103, Ex. 17**), another P&ID-associated company, which as detailed above was also used to pay bribes to former Nigerian officials.

---

[3] Brendan Cahill is believed to be a director and shareholder of SESFTF.

209.   The July 2013 Payment was sent just two weeks after P&ID serve its Statement of Claim on June 28, 2013, setting out its claim for alleged lost profits arising out of the GSPA (**see Ex. 43**), and two weeks prior to the Petroleum Ministry's July 30, 2013 deadline to submit a statement of defense. **See Ex. 115**. Less than two weeks after the Petroleum Ministry failed to timely submit a statement of defense, Lurgi made the August 2013 Payment to Conserve Oil. **See Ex. 101(a)**, at Page 4- Page 5.

210.   In addition, a sum of $30,000 was transferred to Conserve Oil on October 17, 2013, which Mr. Tijani stated Mr. Hitchcock confirmed was intended for him. **See Ex. Ex. 101(a)**, at Page 5; **9(a)**, at Page 8. It is clear from Mr. Tijani's statement that the payments were intended as bribes in relation to the award of the GSPA to P&ID.

211.   The payor of the $30,000 transfer to Conserve Oil on October 17, 2013, SESFTF, is believed to be affiliated with P&ID, as it is controlled by Mr. Cahill (he is believed to be a director and shareholder) and has the same address as Eastwise. **See Ex. 103** and **Ex. 17**.

212.   Mr. Tijani confirmed in a written statement to the EFCC on December 17, 2019, attached as **Ex. 101**, which my legal team has transcribed in **Ex. 101(a)**, that Conserve Oil is a company owned by his "long time friend," Tunde Odebunmi (**see Ex. 9(a)**), at Page 7.Mr Tijani also confirmed that he is one of the signatories to Conserve Oil's bank account at Guaranty Trust Bank Limited. **See Ex. 101(a)**, at Page 1.

213.   Mr. Tijani confirmed in a statement provided to the EFCC on January 12, 2020 (following a revocable plea bargain in his favor), attached as **Ex. 9**, which my legal team has transcribed in **Ex. 9(a)**, that he had been contacted by Michael Quinn in mid-2013 purportedly seeking his support for a project to be executed by Lurgi. Mr. Tijani consequently introduced Neil Hitchcock to Conserve Oil, because it was owned by his long-term friend, Mr. Babatunde

Odebunmi.  **See Ex. 9(a)**, at Page 7.   Based on the timing of this contact, and the procedural context of the Arbitration, it is highly likely that the payments were more connected to the Arbitration than another project that never got off the ground.

214.   In mid-2014, Mr. Tijani received a transfer of N 3.4 million (approximately $20,000) from Lurgi Consults which Mr. Hitchcock told him was "to support [Mr. Tijani] for the upcoming wedding of [his] son and also [Hitchcock's] promise made to [Tijani] earlier during the time [of the] Accelerated Gas project review." **See Ex.9(a)**, at Page 7.

215.   Mr. Tijani received a further transfer of N4 million (approximately $20,000) (as referred to at paragraph 200 above) which Mr. Hitchcock said was to support the wedding of Mr. Tijani's daughter and "earlier promises." **See Ex. 9(a)**, at Page 7.

216.   The EFCC has identified a number of payments from SESFTF to P&ID (Nigeria) and ICIL Nigeria Limited as follows: (a) SESFTF paid $250,000 to ICIL Nigeria Limited on July 31, 2007; (b) SESFTF paid $100,000 to ICIL Nigeria Limited on July 29, 2008; (c) SESFTF paid $50,000 to ICIL Nigeria Limited on July 31, 2008; (d) SESFTF paid $80,000 to ICIL Nigeria Limited on August 15, 2008 (which transactions can be found at **Ex. 97**, at pp. 1, 4) (e) SESFTF paid $34,000 to P&ID (Nigeria) on April 28, 2009; and (f) SESFTF paid $5,000 to P&ID (Nigeria) on March 11, 2011, which transactions can be found at **Ex. 106**.  The reason for these payments is unknown, and our investigation is ongoing.

217.   As detailed above, and in ICIL Nigeria's US dollar account with Guaranty Trust Bank statements, SESFTF (which was controlled by Cahill) appears to have been used as a feeder fund for ICIL Nigeria, transferring funds to ICIL Nigeria whenever its account balance approached zero.  Our initial investigation has uncovered the following transactions from ICIL Nigeria's account:

a.   ICIL Nigeria's US Dollar account with Guaranty Trust Bank shows a large number of substantial, round-figure transactions, many of which are in cash, between July 2007 and September 2014. **See Ex. 123**, a pp. 190-194.

b.   41% of the outgoings from that account were in the form of cash withdrawals. **See Ex. 123**, at pp. 211-213.

c.   A similar pattern of activity can be seen on ICIL Nigeria's Naira account between 2006-8 **See. Ex. 123**, at pp. 195-208. 59% of the outgoings from this account were in the form of cash withdrawals. **See Ex. 123**, at pp. 218-226.

218.   Within these transactions, there is a consistent pattern of amounts paid in, then quickly paid out to another party. For example:

a.   $200,000 was deposited by "Basil" and "Jubril" on July 9, 2007, and $195,000 was withdrawn in cash by Lloyd Quinn on July 12, 2007. This left just $5,000 in the account. **See Ex. 123**, at p. 190.

b.   Regarding the $80,000 that transferred into the account by SESTF on August 15, 2008 (**see Ex. 105**), the same day, $80,000 was withdrawn in cash by James Nolan. This left just $620.43 in the account. **See Ex. 123**, at p. 190 and

c.   $200,000 was transferred from SESTF on  May 21, 2009, and a total of $170,000 was paid out on May 22, and May 25, 2009 (i.e. $115,000 was withdrawn in cash by James Nolan, $15,000 was transferred to an individual named Muhammad Awwal Aliyu, and $40,000 was transferred to "Taka Jewellery"). **See Ex. 123**, at p. 191.

219.   The nature of ICIL Nigeria's business is unclear from the bank statements. We have not identified any deposits that are obviously from customers, or payments to typical business suppliers. There are noticeably few repeat transactions, such as regular payments to suppliers or employees.

a. A large proportion (60% by value) of payments out are foreign exchange purchases and cash withdrawals; and

b. From March 2010, shortly after the execution of the GSPA, activity on the account was significantly reduced; in 2011 there were only four transactions, and no transactions at all between December 6, 2011 and August 27, 2014.

220.    On July 12, 2007, three days after the ICIL Nigeria account was opened, Lloyd Quinn, Michael Quinn's son, withdrew $195,000 in cash. Nigeria is treating this withdrawal as suspicious, given the large amount of cash withdrawn and the known fraudulent activity surrounding the GSPA. **See Ex. 97**, at p. 1.  The EFCC's investigations have revealed several highly suspicious transactions from the ICIL Nigeria account in the days leading up to the January 11, 2010 execution of the GSPA, including the following:

a. On December 21, 2009, $100,000 was withdrawn from ICIL Nigeria's US Dollar account with Guaranty Trust Bank (**see Ex. 97**, at p. 9); and

b. On January 6, 2010, Mr. Nolan made two cash withdrawals of $50,000 and $48,000 from that same account, which withdrawals are being treated as suspicious given the large amount of cash withdrawn and the known fraudulent activity surrounding the GSPA. **See Ex. 97**, at p. 9.

221.    The EFCC's investigations have also revealed that several highly suspicious transactions immediately following the execution of the GSPA:

a. On January 12, 2010, the day after the GSPA was signed Neil Hitchcock sent an e-mail to Adamu Usman, a nominee director of P&ID (Nigeria) and Nigerian lawyer, attaching a Memorandum of Agreement between him and P&ID, which provided for Mr. Hitchcock to obtain a 7.5% equity stake in P&ID. **See Ex. 104**. Such an agreement is not consistent with the operation of

a legitimate petrochemical company. By way of example, this would equate to a value of $750 million to Mr. Hitchcock if P&ID were to recover the amount alleged to be owed under the Final Award. Under any circumstance, this is a highly unusual level of bonus for an employee of a petrochemical company.

b.  EFCC's investigation also revealed that Mr. Kuchazi, a Commercial Director of P&ID and a well-known associate of the then-Petroleum Minister Dr. Lukman entered into an agreement that he would receive three percent (3%) of the post-tax operating profits of P&ID for "facilitating meetings" with the Government.  **See Ex. 8(a)**, at Page 6.  The payments were to be made to Mr. Kuchazi's company, Kore Holdings Limited in return for Mr. Kuchazi inducing Dr Lukman to enter into the GSPA.  **See Ex. 10**.  Mr. Kuchazi was to be paid annually, and was granted access to P&ID's books, according to a letter between him and P&ID dated March 19, 2010.  **See Ex. 10**.

222.   In the immediate aftermath of the execution of the GSPA, a total of US$770,000 was withdrawn from the ICIL Nigeria account at Guaranty Bank Trust in eleven tranches, ten of which were by Mr Nolan (**see Ex. 97**) as follows:

a.  On January 15, 2010, Anekperechi Nworgu withdrew $150,000 in cash (**see Ex. 97**, at p.1);

b.  On January 21, 2010, Mr Nolan withdrew $196,000 in cash (**see Ex. 97**, at p.1);

c.  On January 25, 2010, Mr Nolan withdrew $50,000 in cash (**see Ex. 97**, at p.2);

d.  On February 2, 2010, Mr Nolan made two cash withdrawals of $40,000 and US$20,000 (**see Ex. 97**, at p.2);

e.  On February 5, 2010, Mr Nolan withdrew $50,000 in cash (**see Ex. 97**, at p.2);

f.  On February 12, 2010, Mr Nolan withdrew $55,000 in cash (**see Ex. 97**, at p.2);

g.  On February 17, 2010, Mr Nolan withdrew $55,000 in cash (**see Ex. 97**, at p.2);

h.  On February 23, 2010, Mr Nolan withdrew $39,000 in cash. (**see Ex. 97**, at p.2);

i.  On March 3, 2010, Mr Nolan withdrew $80,000 in cash (**see Ex. 97**, at p.3);

j.  On March 15, 2010, Mr Nolan withdrew $5,000 in cash (**see Ex. 97**, at p.3); and

k.  On March 18, 2010, Mr Nolan withdrew $30,000 in cash (**see Ex. 97**, at p.3).

223.   In the course of the EFCC's investigations, the EFCC has uncovered correspondence between P&ID and J and S Consults in 2014, said to have been sent at the request of "our partner Mr. Mohammad Kuchazi with whom we have been engaged in a major business project for more than 3 years" confirming that "very large-scale earnings ... are payable to [P&ID] in June 2014" and "the anticipated share of income payable to Mr. Kuchazi is now calculated at not less than five million US Dollars." **See Ex.109**.   Mr. Kuchazi has admitted to the EFCC in his written statement dated September 7, 2019 that he advised P&ID of his rent arrears and P&ID subsequently sent the letters assuring Mr. Kuchazi's landlord that payment would be made in short order.  **See Ex. 8(a)**, at Page 12.   Our investigation of Mr. Kuchazi is ongoing.

224.   The EFCC investigations have not yet uncovered direct evidence of bribes paid to Dr. Lukman himself.  However, the EFCC is continuing to investigate the possibility that Dr.

Lukman (the then Petroleum Minister) stood to gain from the agreement between Mohammad Kuchazi and P&ID in which Kuchazi (through his company, Kore Holdings) was to receive three percent (3%) of the post-tax operating profits of P&ID in return for "facilitating meetings" with the Government. **See Ex. 10, Ex. 8(a)**, at Page 6. Investigations in this regard are ongoing. Mr Tijani's recent statement to the EFCC suggests that Dr. Lukman was proactively promoting P&ID's cause in the Ministry prior to the GSPA being entered into, and instructed Mr. Tijani to give the company "all the necessary support" for the project. This is highly suspicious in circumstances where, as Mr. Tijani has admitted, no proper due diligence was carried out on P&ID.

225.    The EFCC is also investigating money or other financial incentives provided to other government employees, officials or ministers other than the individuals mentioned above. These investigations commenced in August 2018 and are ongoing. Key staff have been invited to be interviewed and their statements have been taken. The EFCC is also undertaking an analysis of key employees. Nigeria will of course update the Court if further suspicious payments or other fraudulent activities are uncovered.

## VII.    Criminal Prosecutions in Nigeria to Date

226.    On September 19, 2019, Nigeria filed charges against P&ID, P&ID (Nigeria), and Messrs Quinn (deceased), Hitchcock and Cahill for their fraudulent procurement of the GSPA. **See Ex. 110**.

227.    Nigeria successfully prosecuted P&ID and P&ID (Nigeria) in September 2019. The charges against P&ID and P&ID (Nigeria) were filed on September 17, 2019, and served on Mr. Kuchazi, the Commercial Director of P&ID, and Adamu Usman, a shareholder and director of P&ID (Nigeria) (also a Nigerian-qualified lawyer), on September 19, 2019. **See Ex.95**.

228.  Both companies, P&ID and P&ID (Nigeria), pled guilty and were convicted of offences relating to fraudulent misrepresentation, trading without appropriate licences, under-payment of tax, breaches of money laundering laws and concealing and laundering proceeds of unlawful acts. **See Ex. 95**.

229.  On November 19, 2019, Nigeria issued its First Amended Charge against James Nolan, Adam Quinn (Mr. Quinn's son), ICIL, and Goidel, charging them with, among other crimes, money laundering including in connection with bribes paid to Nigerian government employees connected to the GSPA scheme. **See Ex. 111**.

230.  On September 19, 2019, Nigeria filed charges against Ms. Taiga and Dr. Lukman (deceased) for their roles in causing Nigeria to enter into the GSPA and against Ms. Taiga for her receipt of bribes. **See Ex. 112**.

231.  On December 12, 2019, the criminal trial of Ms. Taiga resumed before the Federal High Court in Abuja, although it has since been adjourned again at the request of Counsel due to Ms. Taiga's poor health.

232.  On October 21, 2019, the EFCC arraigned Mr. Nolan and Adam Quinn. The charges relate to money laundering and tax evasion, including the failure to register certain companies with Nigerian money laundering authorities, and to notify certain large, unexplained payments to the relevant authority under Nigerian law. **See Ex. 113**, at p. 2.

233.  Mr. Nolan and Adam Quinn are both directors and shareholders of Lurgi, the company which made payments to Mr. Tijani. The two are also directors of P&ID (Nigeria) Limited, Goidel Resources Limited and ICIL Nigeria Limited and Mr. Nolan is also a signatory to P&ID's bank account.

234.    On December 16, 2019, the criminal trial continued of Mr. Nolan before the Federal High Court in Abuja.  The proceedings also concern Goidel Resources Limited and ICIL Limited, who are the First and Second Defendants respectively.  Mr. Nolan and Adam Quinn are both directors of each company.

235.    Mr. Nolan is currently on remand for failure to comply with his bail conditions.

236.    On December 18, 2019, the Federal High Court in Abuja granted the EFCC's application to extradite Adam Quinn for prosecution on 25 counts including money laundering. At the time of making this Declaration, Adam Quinn remains at large.

237.    Mr. Cahill is one of the co-founders of P&ID and a director and the company secretary of ICIL. At the time of making this Declaration, Mr. Cahill is at large.

238.    These charges may have no direct bearing on the GSPA. However, it appears that P&ID and its affiliated companies operating in Nigeria form part of a common criminal enterprise.

239.    On December 19, 2019, former Attorney General, Mr. Adoke was taken into custody by the EFCC in relation to alleged abuse of office and money laundering in relation to the OPL 245 deal. Mr. Adoke had been charged by the EFCC with corruption and money laundering for receiving funds as payment for negotiations he allegedly brokered between Shell, Eni and Malabu for OPL 245.

240.    While to date we have not uncovered any direct evidence implicating Mr. Adoke in the P&ID fraud, our investigations is ongoing.

**VIII.   Discovery Sought Under 28 U.S.C. § 1782**

241.    In order to further our investigations and prosecutions in Nigeria concerning the GSPA fraud, we respectfully enlist the assistance of this Court pursuant to 28 U.S.C. § 1782 to

acquire documents and testimony relating to transactions that were processed through the United States and entities located in the United States. Nigerian law permits the type of discovery requested in the 28 U.S.C. § 1782 application, and its courts are receptive to receiving evidence obtained in a United States judicial proceeding, including discovery pursuant to 28 U.S.C. § 1782. There is no rule or policy in Nigeria prohibiting the use of such evidence by the Nigerian courts, investigators or prosecutors in the Nigerian Proceedings.

242.    Nigeria's investigation to date has already revealed significant contacts with the United States, and New York in particular. Therefore, we seek to obtain discovery from entities and individuals located within the Southern District of New York. For example, we know that several bribes were paid to individuals through local Nigerian banks in U.S. dollars. Because the bribes were paid in dollars, by necessity the transactions went through New York correspondent bank accounts in order to be paid in U.S. dollars.

243.    We believe based on our investigation to date that numerous transactions in the scheme, including wire transfer bribes paid in U.S. dollars and money laundering for cash bribes were conducted by P&ID and its affiliates that would be evidenced in the banking records of banks in New York that act as correspondent banks for transacting banks. Therefore, we seek records from the banks in New York that we believe are most likely to have been involved in U.S. dollar transactions that are relevant to the GSPA scheme.

244.    In addition, VR Advisory Services, which is a twenty-five percent shareholder of P&ID, is based in New York, with an office at 300 Park Avenue, 16th Floor, New York, New York. Despite a wide-ranging investigation to date, we have been unable to uncover any business that P&ID conducted other than the sham GSPA. As an investor in P&ID, VR

Advisory Services is likely to have information concerning P&ID, the GSPA, and the Arbitration, all of which are relevant to Nigeria's ongoing investigations and prosecutions.

245.   The information Nigeria seeks in New York relating to the GSPA scheme include: (a) financial records from New York financial institutions providing further evidence of bribes and money laundering relative to the GSPA scheme, such as any transactions between P&ID and its various affiliates and any recipients in Nigeria; (b) financial records from New York financial institutions revealing payments to Nigerian government employees and officials; (c) records concerning activity by P&ID to establish that P&ID did not have operational, infrastructure, and human resources to undertake the massive GSPA project; and (d) records concerning the ownership and capital structure of P&ID, including to enforce the sentence Nigeria has imposed on P&ID to surrender its assets to Nigeria. The specific documents Nigeria is requesting are set forth in the proposed subpoena attached to the accompanying Declaration of our United States counsel, Alexander D. Pencu, Esq.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 24 , 2020
          Lagos, Nigeria

Abubakar Malami SAN

Attorney General of the Federation
and Minister of Justice of Nigeria